(82 South. 711)

No. 23155.

STATE v. MORGAN.

(March 3, 1919. On Rehearing, June 30, 1919.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW ⬯1150—CHANGE OF VENUE — DISCRETION—AFFIRMANCE—EVIDENCE.

The facts that, in a motion for a change of venue in a criminal case, the prosecuting officer suggests the parish to which the case should be sent, and that the defendant objects but is willing that it should be sent to any other parish, will not, necessarily, prevent this court from affirming a judgment ordering the transfer to the parish thus suggested and objected to. The decision of the question of affirmance or reversal depends upon the sufficiency, in the opinion of this court, of the evidence and of the reasons upon which the trial judge has based his ruling.

2. JURY ⬯72(1) — TALES JURY — POWER OF JURY COMMISSION.

Under Act No. 122 of 1916, amending and re-enacting Act No. 182 of 1914, amending and re-enacting section 11 of Act No. 135 of 1898, relative to juries, it is competent for a jury commission, at any time and without an order of court, to supplement the list of tales jurors in the tales jury box until the full complement of 100 is reached.

3. CRIMINAL LAW ⬯1165(1) — WITNESSES ⬯2(1)—RETURNS ON SUBPŒNAS FOR WITNESSES — RIGHT OF DEFENDANT—REVERSAL.

Though a defendant in a criminal prosecution should be allowed to determine for himself whether he requires returns upon the subpœnas issued, and attachments for his witnesses, before entering upon the trial, yet, in a case which has been three times tried and in which many witnesses are summoned, the failure of the trial judge to accord those privileges will not be held as a sufficient ground for the reversal of a conviction, where it appears that the witnesses came in, during the trial, in time to give their testimony, and no prejudice to defendant, resulting from the failure of the judge to act as requested, is shown.

4. JURY ⬯85 — EXCUSING JUROR — DISCRETION.

It is no abuse of the discretion of the trial judge in a criminal case to excuse a venireman from service on the jury when it appears that the latter has testified upon the hearing of a motion to change the venue in the case.

5. HOMICIDE ⬯156(1, 2), 166(1) — MOTIVE—EVIDENCE.

Testimony as to statements made by a deputy sheriff, a few hours before his death, as to his purpose to arrest for "bootlegging" a person charged with, and on trial for, his murder, and showing that he did not attend a lodge meeting at which he might otherwise have been expected, may be admitted in evidence on such trial as tending to show motive and intent on the part of such person.

6. CRIMINAL LAW ⬯1170½(6) — OBJECTION TO QUESTION—REVERSIBLE ERROR.

No reversible error is disclosed where a trial judge, in a criminal case, sustains an objection to, and instructs the jury to disregard, a question based upon a fact not established, and propounded by the prosecuting officer to a state witness; provided no injury is shown to have resulted to the defendant in such case.

7. JURY ⬯127 — DISQUALIFICATION—TIME FOR OBJECTION.

The proper time to object to a venireman, because of disqualification, is when he is presented; and, if on his voir dire he states, in answer to questions propounded to him, that he has been charged with an offense and has not been tried, it will be too late thereafter, and after the state has devoted the better part of two days to the examination of its witnesses, for the defendant in a criminal prosecution to

move that the jury be discharged and a mistrial entered; and particularly is that true, when the information so given by the venireman was imparted to the counsel then representing the defendant in the case on trial, but who had represented the venireman in the matter of the offense to which he referred, and that, notwithstanding that, by reason of its being many years old, the counsel may have forgotten the charge or have assumed that it had been disposed of.

8. WITNESSES ☞277(2)—EVIDENCE—AUTHORITY OF DEFENDANT TO WEAR EMBLEM OF FRATERNAL ORGANIZATION—ERROR.

Where, in a trial upon a charge of murder, the defendant has taken the stand, wearing a ring bearing the emblems of a widely known fraternal organization, he may properly be asked, on cross-examination, whether he wears it by authority and with a view of affecting the verdict, but the question whether he expects thereby to save his neck from the gallows is an improper one, though not necessarily calling for the reversal of the conviction.

9. CRIMINAL LAW ☞724(2)—CLOSING ARGUMENT—PURPOSE—CHARACTERIZATION.

The purpose of the closing argument in a prosecution for murder is usually to deduce from the testimony the guilt of the defendant, and, if the deduction, in the opinion of the prosecuting officer, is legitimate, he is within his rights in characterizing the defendant as a murderer; or he may use an equivalent, such a "monster."

10. CRIMINAL LAW ☞726—CLOSING ARGUMENT OF PROSECUTION—REVERSAL.

A remark by the prosecuting officer in his closing argument, as a necessary, or proper, answer to what has been said in the argument of defendant's counsel, though otherwise improper, affords no grounds for setting aside a conviction.

11. CRIMINAL LAW ☞1168(2)—CLOSING CASE —TRANSCRIPT OF STENOGRAPHIC NOTES.

Unless it be shown that the defendant in a criminal prosecution was thereby injured, the refusal of the trial judge to await the transcription of the stenographic notes of the testimony, before requiring the case to be closed, affords no ground for the reversal of the conviction.

12. CRIMINAL LAW ☞192—FORMER JEOPARDY—JURISDICTION—SENTENCE.

Where a defendant in a criminal prosecution is convicted of murder, with the qualification "without capital punishment" (which a jury may add) and, upon his appeal and at his instance, the conviction is annulled on the ground that a judgment ordering a change of venue and the transfer of the case from the court in which it originated to the court in which the conviction was obtained was unauthorized and illegal, and hence that the trial court was without jurisdiction, such defendant, upon a subsequent trial of the case, properly transferred to the same court, may be convicted of murder with the penalty of death; the prior conviction in a court not vested with jurisdiction affording no basis for the plea of autre fois acquit, quoad the original charge of murder.

13. CRIMINAL LAW ☞291—PLEA OF AUTRE FOIS ACQUIT—TIME FOR FILING.

The plea of autre fois acquit should be filed in the trial court before conviction.

14. CRIMINAL LAW ☞1110(6) — TRANSCRIPT OF APPEAL—SUPPLYING OMISSION.

The state, as appellee, is not responsible for an omission from a transcript in a criminal appeal of a copy of the minutes of the trial court showing the arraignment of the defendant and, without certiorari, may supply the omission by certificate from the clerk of the trial court.

Provosty, J., dissenting.

## On Rehearing.

(Syllabus by Editorial Staff.)

15. CRIMINAL LAW ☞720½, 722(2) — FAIR AND IMPARTIAL TRIAL—REHEARING.

In prosecution of colored man for murder of white deputy sheriff, where evidence was circumstantial, insinuating remarks in statements in argument and in questions by prosecuting attorney to defendant while he was testifying, suggesting that he was guilty and was using ulterior means for obtaining an acquittal, were well calculated to prejudice defendant and resulted in an unfair trial.

16. CRIMINAL LAW ☞419, 420(6)—HEARSAY —PREJUDICE.

In trial for murder of a deputy sheriff, testimony of the state's first witness, before corpus delicti had been proved, as to a conversation with deceased a few hours before his death, to effect that defendant was a bad negro and a bootlegger, and that deceased was afraid of him, and that defendant had told deceased, a white man, that he was no better than a negro, was hearsay and inadmissible and highly prejudicial.

Monroe, C. J., dissenting.

Appeal from Fifth Judicial District Court, Parish of Jackson; Cas Moss, Judge.

Pete Morgan was indicted for murder, his opposition to the State's motion for a change of venue was overruled, and he was convicted of murder and sentenced to be hanged, and he appeals. Reversed and remanded.

See, also, 142 La. 755, 77 South. 588.

R. E. Milling, of New Orleans (George Wear, Jr., of Jena, W. J. Hammond, of Jonesboro, and E. E. Kidd, of Winnfield, of counsel), for appellant.

Allan Sholars, of Monroe, amicus curiæ.

A. V. Coco, Atty. Gen., and Julius T. Long, Dist. Atty., of Winnfield (Thomas S. Price, of Ruston, and Vernon A. Coco and Thomas W. Robertson, both of New Orleans, of counsel), for the State.

MONROE, C. J. Defendant was indicted by the grand jury of the parish of Winn, in November, 1916, for the murder charged to have been committed in April of that year, of Ernest Howell, a deputy sheriff, native and lifelong resident of the parish. He was tried, and the jury, being unable to agree, was discharged. When the case was called for a second trial, he moved for a change of venue to some parish in an adjoining district that the judge might select, alleging many reasons, and, among them, prejudice throughout the parish against the negro race, of which he is a member, and, in the sheriff's office, against him in particular, and that the prosecution "on the part of the state's attorney had, in his judgment and belief, descended into a persecution."

The motion was denied, and there was a second mistrial, whereupon the state moved that the venue be changed to the parish of Jackson, which is the other of the two parishes constituting the Fifth judicial district and adjoins the parish of Winn. Defendant opposed the motion, upon the grounds, mainly, of prejudice against negroes in the parish of Jackson and that the widow of the deceased, Ernest Howell, was a member of a family, settled in that parish, which, by reason of its size and influence, would be able to prevent defendant from obtaining a fair trial and just verdict. He also moved that the judge of the Fifth judicial district court be recused. The opposition and motion to recuse having been overruled, the case was sent to the parish of Jackson and there tried, with the result that defendant was convicted of murder, without capital punishment, and sentenced accordingly which conviction and sentence were reversed on appeal to this court, for the reason that, upon the hearing of the motion to change the venue, the trial judge had excluded evidence offered on behalf of defendant in support of his allegation as to inimical public feeling and prejudice in the parish of Jackson, and the case was remanded with instructions that the hearing of the motion be reopened and proceeded with and defendant have another trial, according to law. State v. Morgan, 142 La. 784, 77 South. 588. The second hearing of the motion having been had, and the previously excluded evidence admitted, defendant's opposition to the change of venue was again overruled, and, the case having been again tried, he was found guilty as charged and sentenced to be hanged, and from that conviction and sentence he prosecutes this appeal, presenting his case by means of numerous bills of exception, which are now to be considered:

Bill 1 was reserved to the order, made in the district court sitting for the parish of Winn, changing the venue to the parish of Jackson; bill 2, to the fixing of the case for trial in the district court for that parish; and bill 5 was reserved on the third day of the trial and after the twelfth juror had been accepted—all predicated upon substantially the same grounds, to wit:

That a fair and impartial trial could not

be obtained in the parish of Jackson on account of the sentiment against the negro existing in the minds of the people of that parish and of the predominating influence of the Shows family, to which the widow of the decedent was related, and of which the clerk of the court, or his wife, as also the chief deputy clerk and chief deputy sheriff, were members.

We make the following excerpts from the elaborate reasons assigned by the trial judge for the rulings complained of, to wit:

On the question of the general sentiment towards the negro race:

"The testimony shows that there is a general sentiment, not unlike, nor any more pronounced than, a sentiment in adjoining parishes and throughout the state, that the white race is superior to the negro race, and that there is a difference in the social standing of the two races; but that sentiment is not so strong that it operates as prejudice against the negro race and would prevent even a negro charged with killing a white person from obtaining a fair and impartial trial. * * * We think the testimony utterly fails to show any prejudice against the accused such as would prevent a fair trial being had in the parish of Jackson, but, on the contrary, he can obtain a fair trial, and no race feeling or prejudice would influence a jury in arriving at their verdict. * * * "

On the question of the relationship and influence of the Shows family:

"The wife of the deceased was a daughter of Tom Shows, whose father was a nephew of the branch of the Shows family in Jackson parish. They came to this parish almost a century ago, and the Tom Shows branch came later. The father of Tom Shows died, and he (Tom) went into Winn parish, where he resided and principally reared his family, including the wife of the deceased. Deceased was also reared in Winn parish, near the same community in which the Shows family were reared. During those years, there was very little recognition of relationship or intimacy between the two families. When Howell was killed, no concern or interest was manifested by any of the family residing in Jackson parish about the conviction of the accused. While the case was on trial in Jackson parish, no interest was man-ifested by them. When counsel was employed to assist in prosecuting the case, they were not interested to the extent that they were willing to contribute to the payment of his fee; none of them attended either of the trials in Winn parish, and they manifested no interest whatever while the case was on trial in Jackson parish. They are shown to be a very quiet, honest, class of citizens, who attend strictly to their own business and do not make themselves aggressive in public life, and" (are) "disinterested in the courts of Jackson parish. They contribute a small per cent. of the citizenship of Jackson parish and reside almost wholly within the Weston and Hebron communities, except the deputy sheriff and his family, together with his father and family and the deputy clerk, who reside at Jonesboro. There are 21 voters in the family, all of whom vote at three, of the fifteen, precincts of Jackson parish, and this number constitutes a very small per cent. of the voting population, which numbers more than 1,200. There are more than 1,600 persons eligible to jury service in Jackson, and less than 100 of those persons are connected with the Shows family. It seems that the Shows family have never desired or attempted to wield any influence, further than what was right and proper, in the public life of the parish, and none at all in the courts thereof. * * * Their acquaintance is more or less limited, their residence is confined to a small area as compared with the whole parish, and their per centum of citizenship as compared with the whole parish is small. * * * The testimony has failed to show that a jury could or would be influenced by such relationship, and we see no legal reason why the case could not be fairly and impartially tried in Jackson parish."

On the question of the selection of Jackson parish as the parish to which the case should be tried, the learned judge says, quoting in part:

"During the three former trials, between 65 and 70 witnesses testified at each trial. The parish of Winn has refused to pay this host of witnesses, except 12 to each side, and hence the greater number have been compelled to leave their homes and business and attend court, during each trial, at their own expense. On account of the double daily passenger train service from Winnfield (in Winn parish) to Jonesboro" (the parish seat, where court is held, of Jackson parish) "those witnesses, who reside principally in Atlanta and Winnfield, did, on the last trial, and could now, go to Jones-

boro and return without being forced to remain over for any length of time. Jonesboro is the nearest courthouse to Winnfield, the distance being only 23 miles. Colfax, in Grant parish, is the next nearest courthouse to Winnfield, but the train service is not so convenient, and witnesses would be compelled to lose more time attending court. Then, too, the district attorney of the Thirteenth district, * * * comprising Grant parish, was one of the counsel for the accused, during the first trial. Natchitoches, La Salle, Caldwell, and other parishes that might be mentioned are less accessible on account of greater distance and railroad accommodations being less convenient. The law directs that a change of venue shall be awarded 'an adjoining parish of the said judicial district,' before it mentions an 'adjoining district.' Thus, it would seem that an adjoining parish of the same judicial district is preferable. * * * In our opinion, no legal reason has been established why the accused could not obtain a fair and impartial trial in Jackson parish, and, that being an adjoining parish of the same judicial district and, in addition, the nearest location to the courthouse of Winn parish, we think the order transferring the case to Jackson parish is in accord with both the spirit and literal meaning of the law, and hence the change of venue, after hearing the testimony, was thus ordered."

It was said by us on the previous hearing of this case:

"The judicial discretion thus vested in the judge" (referring to the discretion vested in the trial judge in the matter of granting or refusing a change of venue) "will always be presumed to have been wisely exercised and, as a rule, will not lightly be interfered with, but it is nevertheless subject to review." State v. Morgan, 142 La. 755, 77 South. 588.

[1, 2] And so, in this instance, reviewing the action of the trial judge and the reasons therefor, not lightly, but after the most serious consideration, we have reached the conclusion that the action was both legal and well advised, and the reasons sustained by the facts. The impression or conviction that we derive from the testimony, as to the sentiment prevailing in Jackson parish towards people of the negro race, is well expressed in the language of the learned judge. The white citizens of that parish, like all other Caucasians in this part of the United States, and, as we believe, throughout this country, consider themselves the superiors of their fellow citizens of the African race, and, for that reason, the vast majority of them feel themselves all the more bound, when called to sit upon juries by which their rights are to be determined, to accord the negroes that justice to which the law entitles them. It is a significant circumstance that no witness who was examined in this case was able to say that he had ever heard of the conviction, in Jackson parish, of a negro who was thought to be innocent of the crime with which he was charged. One witness was found to give the following remarkable testimony:

"Q. Would you give him a fair and impartial trial, yourself, if you were selected as a juror in this case? A. No, sir. Q. Would you go into the jury box and weigh the law and the evidence as produced in the trial and given by the court and give this negro a fair and impartial trial? A. No, not—I don't know so much about that. Q. Do you know of anybody else in this country that would? A. I am not speaking about other people. Q. Can you think of any other people that would do that? A. I am not telling you what other people would do; I am telling about myself. * * * Q. You say you would not give him a fair and impartial trial? A. I say I would give him a fair trial if I heard the evidence and everything and it was connected up. Q. Would you convict him without evidence? A. No, sir. Q. Would you do that if you were taken on the jury? A. In the first place, I wouldn't be drawn on the jury. * * * Q. How would you get off? A. I would tell them that I wouldn't give him a fair trial. Q. Does that mean that you would go on a jury and convict a negro without sufficient evidence to warrant a conviction? A. Well, if I got on the jury, I would, of course, go according to the law and evidence, but I am not going to get on the jury. Q. Yet, you would swear that in order to get off? A. Certainly, because I don't want to have anything to do with a negro in court."

It is hardly necessary to observe that a person who would so testify would not be

a fit person to serve on any jury. But the witness who gave the testimony does not represent the citizenship of Jackson parish, or pretend to, or know their sentiments. The witnesses who were called were, as a rule, men of character and standing, former sheriffs and clerks of court, merchants and farmers, a physician and others, whose residences or occupations afforded them opportunities of knowing the people of the entire parish; some of whom had never heard, and others had heard but little, of the Shows family; and the great preponderance of their testimony was to the effect that a negro, charged with the killing of a white man, could get a fair trial in the parish. And the same thing may be said in regard to the testimony concerning the Shows family. A few of the witnesses, who perhaps live in the Shows neighborhood and seldom go far afield, seem to have conceived the most extravagant ideas of their number and influence, and reckoned every family into which a Shows may have married as having been thereby gathered in by the Shows. But, while some of the witnesses thought that, if the Shows were to throw the weight of their influence, plus that of their connection by marriage, in favor of the conviction of a person, white or black, charged with an offense, it would go hard with that person not one of them intimated that the Shows had ever attempted or desired to make use of their influence in that way; by far the majority being of the opinion that they are not people of that character.

Finally it is not suggested that any member of the family or person remotely connected with it served on the jury, and it appears from the evidence that, with the exception of the three or four distant cousins, living in Jonesboro, of the widow of Ernest Howell, who, with her husband, was reared in Winn parish, none of her other relations, say, fourth and fifth cousins, living about Weston and Hebron, concerned themselves in the least about either of the trials, whether those held in the one parish or the other. On the other hand, it is not alleged, and does not appear, that, as a matter of fact, defendant was prejudiced by reason of any sentiment in Jackson parish less favorable to people of his race and color than that which prevails in any other parish in the state. He was represented by able counsel, one of them a native of the parish, another a resident and practitioner there, and a third a native and practitioner in a nearby parish, and we find no reason for holding that they failed to secure him an unprejudiced jury and a fair and impartial trial, and hence no reason for holding that the trial judge abused the discretion vested in him, in ordering the transfer of the case to Jackson parish. State v. Morgan, 142 La. 755, 77 South. 588; Marr's Crim. Jur. p. 589.

Bills 3 and 7 were reserved to the ruling of the court in sustaining, as legal, a supplementing, by the jury commission, of the names in the tales jury box, without (as it is said) an order of court authorizing such action; and, in overruling defendant's objection to the selection, for service on the jury of persons whose names were drawn from the list so supplemented. The bills appear to be predicated upon Act 182 of 1914, p. 341, but the rulings to which they refer were based on Act No. 122 of 1916, pp. 279, 280, which amends and re-enacts Act 182 of 1914 and, in so doing, provides:

"That the jury commission may, at any time, without the order of the court, supplement the names in said tales jury box until the full complement of 100 is reached."

Bill 4 shows that defendant had caused 18 witnesses to be subpœnæd, and that they had been served personally, but were not present on April 22d, when the case was called for trial, and that he asked that they be attached, which request the trial judge refused, saying that he would cause the at-

tachments to issue later on, "at such time as he thought proper," to which the objection and bill were reserved.

The statement per curiam is that the case was called on April 22d and the trial concluded on May 1st; that the police jury had paid only 12 witnesses on each side, on the previous trials, and that he did not cause attachments to issue until April 24th, when the jury was completed; that all of the witnesses named by defendant, except J. H. Young, who was shown to be ill in bed and unable to attend, and Oscar Hyde, who could not be found, attended court, and most of them were sworn on behalf of defendant, who made no objection to closing the case without the testimony of Young and Hyde; and that he sustained no prejudice by having the case proceeded with.

[3] Bill 5 shows that defendant had, in due time, caused subpœnas to be issued for six witnesses, whom he names, and who were duly served, but were not present and with respect to whom no returns had been made when the case was called; that he objected to going on until the returns were made; and that his objection was overruled. Hence the objection and bill. The statement per curiam is about the same, mutatis mutandis, as that attached to bill 4; that is to say, that all of the witnesses, save one, appeared (at some time during the trial) and gave their testimony, and that the one who did not appear could not be found, after diligent search, but that his testimony had been taken on a previous trial, and the district attorney offered to allow defendant to introduce it, as then taken down, and have it read to the jury, which offer was declined.

It does not appear from bill 4 that defendant asked that the case be continued or objected to going on with the trial; but bill 5 shows that he objected to proceeding with the trial until returns were made upon the subpœnas.

We are unable to say, in either instance, that he sustained such prejudice as would call for a reversal of this conviction and sentence; but it is quite clear, we think, that he should have been allowed to determine for himself whether he would enter upon a trial, in which his life was at stake, without positive assurance that his witnesses had been summoned and would be present. That, as afterwards ascertained, they had been summoned, and that they appeared at a later stage in the proceedings, in so far as it was possible to secure their presence, does not altogether meet the requirements of such a situation.

[4] Bill 8 shows that, over defendant's objection, the court excused N. L. Clinton, a venireman, for the reason that he had testified as a witness upon the hearing of the motion to change the venue. The matter was within the discretion of the trial judge, and the ruling afforded defendant no just cause of complaint.

Bills 9 and 10 were reserved to the overruling of defendant's objection to the testimony of Ellis Teddlie and Elzie Jennings as to certain statements made by the deceased, during the day and evening of the homicide, to the effect that he was on the lookout for defendant and expected to arrest him that night "for bootlegging." The testimony was admitted to show the whereabouts and purpose of deceased and the motive for the killing on the part of defendant. The question presented was ruled upon when the case was heretofore considered (142 La. 768, 769, 784, 77 South. 588), and we adhere to the view then expressed that defendant's objections were properly overruled.

[5] Bill 11 contains the recital that the district attorney asked a state witness whether he had attended the unveiling of a monument to the deceased, erected by the Woodmen of the World, which was objected to, on the ground that certain of the jurymen were members of the organization mentioned and that the purpose of the question

was to inform them that deceased was also a member and to excite prejudice against defendant; and that the court sustained the objection; but that, immediately thereafter, the district attorney asked the witness whether he saw the deceased at the Odd Fellows Lodge, to which defendant objected, and, the objection having been overruled, witness answered, "No"; that the witness was then asked: "Did he ever go to the lodge," which was objected to as immaterial and improper; and it does not appear that the court made any ruling thereon, or that the question was answered, the bill of exception having been reserved "to the conduct of the district attorney in proposing those questions," etc. The statement per curiam is that—

The "objections to questions proposed were sustained except as to the question, 'I will ask you if you saw Mr. Howell at the Odd Fellows Lodge' (meaning the night of his death), and that it was permitted to be answered for the purpose of showing the whereabouts of the deceased, as well as the reason for his being at different places, the night of his death. Testimony had already been introduced to show that he (deceased) was making an effort to catch the accused, as well as other parties, on that night, retailing liquor without license, and this particular question and answer were admitted to show motive and intent" (on the part of defendant).

We find no error in the ruling, and no injury to defendant is alleged or shown to have resulted therefrom.

Bills 12, 13, 15, 16, 17, 18, 19, and 20 were reserved to questions asked and statements made by the district attorney, as follows to wit:

[6] 12. Question, to Mr. Collins, "who is a white man" (defendant in this case is a negro) "propounded before defendant had offered any evidence. Pete Morgan emphatically denies that he went in the direction of the Germaine-Boyd Mill quarters on that night, or that he was in your store at 9·30. I will ask you whether or not you are positive of what you say." Objected to as leading and suggestive and intended to prejudice the jury against defendant. Objection sustained, and jury instructed to disregard statement or question as part of the evidence in the case.

We discover no error in the ruling or action of the court, and the error of the district attorney, in assuming a fact not then in evidence, does not call for a reversal of the conviction, the more particularly as the jury were instructed to disregard the assumption. The existence of the fact assumed is, however, not disputed, and no injury to defendant is alleged or shown. Non constat but that the fact (the denial by defendant) was thereafter established by the state.

13. State witness requested to detail all the facts and circumstances connected with the case with which he was familiar, objected to as calling for a narrative which would not afford defendant an opportunity to make proper objections, which objections having been overruled, bill was reserved. The bill further recites that the witness proceeded to make his statement in narrative form, and that it "contained hearsay and opinions and was otherwise objectionable." The testimony of the witness which is annexed to the bill does not bear out the statement that it was given in narrative form; it appears in the usual form of questions and answers, with, here and there, objections and rulings by the court, but no bills reserved with respect thereto. The general bill (No. 13) is not insisted on in the brief of defendant's counsel.

15 contains the recital that defendant, being on the stand as a witness in his own behalf, was answering a question propounded by the district attorney, when that officer interrupted with the statement, "Pete, we have too many contradictions to take up to spend much time on that one," to which counsel for defendant objected. The objec-

tion was sustained, and the court instructed the jury that the statements of the district attorney were not evidence and that they should disregard them.

The court committed no error, and that of the district attorney does not call for the reversal of the conviction.

16 contains the recital that, defendant being under cross-examination, the district attorney asked him the question:

"Pete, you were talking about your business. You don't mean to say that you are too good to bootleg whisky, do you?"

Objected to and objection sustained, and jury instructed to disregard statement, of the district attorney—that it was not evidence.

The form of the question was perhaps objectionable, but we must attribute to the jury sufficient intelligence to have enabled them to understand that it established no fact, and that under the instruction of the court they were to disregard its implication in that respect. The district attorney states, in his brief, that defendant had stated that he had business to attend to, intimating that he was not a bootlegger, whereas, he had, at one time, pleaded guilty to that charge.

17 shows that, defendant having been tendered to the district attorney for cross-examination, that officer propounded to him the question:

"Now, Pete, I am going to let you explain a few contradictions between your testimony and the testimony of other witnesses in the case"— which was objected to, objection overruled, bill reserved, and jury instructed that statements of counsel were not evidence and they should disregard them.

If there were contradictions in the testimony, we can see no objection to the question, and, if there were not, the jury was there to appreciate that fact and, with the instruction of the judge, could hardly have been misled by the reference thereto, to the prejudice of defendant, who was represented by counsel well able to protect his interests.

[7] Bill No. 14 was reserved to the overruling of a motion to discharge the jury and enter a mistrial, the ground set up being that one of the jurors who had been accepted and mingled with the others was disqualified by reason of the fact that he had been indicted for conspiracy to commit an assault and for committing an assault and battery upon a negro, and had never been tried or discharged.

Upon the hearing of the motion, which took place at once, a bill of information, which had been filed on March 9, 1904, charging the juror with the offense mentioned, was filed in evidence, and certain oral testimony was taken, the substance of which was as follows:

The juror in question was the twelfth accepted, completing the panel. During the examination on his voir dire, one of defendant's counsel asked him whether he had ever been charged with any offense, to which he replied that he had. Counsel then asked him whether he had ever been tried, and he replied that he had not. The juror was then accepted by the state, and the three counsel for defendant, after consulting together, also accepted him. It seems that the counsel who was conducting the examination on behalf of defendant recalled, while so doing, that he had been employed to defend the juror against the charge to which he referred, which circumstance he made known to his associates in their conference, and that they considered whether he would be an acceptable juror in view of the fact that he had been charged with an assault and battery upon a negro. Having accepted him, and the jury having been completed, the taking of the state's evidence began (according to the statement per curiam) about 10 o'clock on the morning of Wednesday, April 24th, and continued during the session of that day

and all of Thursday, and it was not until the morning of Friday, the 26th, that the motion here under consideration was filed. The matter was, however, discussed between defendant's counsel on Wednesday evening, and some steps were taken towards ascertaining definitely from the docket of the court what disposition had been made of the charge against the juror. Precisely why the counsel should have been unwilling to accept the sworn statement of the juror that he had not been tried does not appear, nor why they should not have prosecuted their inquiry on Wednesday and Wednesday evening and during the day on Thursday; but it is alleged in the motion that—

"Neither defendant nor his counsel knew of these facts" (i. e., that the juror had not been tried for the offense with which he had been charged) "until last night" (meaning Thursday night) "after court had adjourned, and the motion is filed at the first opening of court after information of the pendency of the charge against the said juror reached your defendant or his counsel."

It was shown that the last minute entry in the prosecution in question had been made on September 6, 1904, and showed a continuance; and that between 1904 and 1907 there were omissions, in the minutes, of reports of grand juries, and such as that—

"I didn't find any criminal docket entries" (says the clerk) "of any cases tried about that time."

It may be, therefore, that the prosecution had been dismissed, and yet, if it had, the defendant therein would have been likely to have heard of it, and his statement that he had not been tried was, at all events, sufficient to have put defendant herein and his counsel upon inquiry in the matter. We are therefore of opinion that their objection to the juror, under the circumstances, came too late. State v. Canton, 131 La. 261, 59 South. 202, and authorities there cited; State v. Nash & Barnett, 45 La. Ann. 1145, 13 South. 732, 734; State v. Bird, 38 La. Ann.

499. The cases thus cited (and there are many others to the same effect) hold that the proper time to test the qualifications of a juror is when he is presented, and that it is too late to raise questions of age, residence, citizenship, etc., on motion for new trial or in arrest of judgment. The statute (Act 135 of 1898, § 1) places those disqualifications, and that resulting from the pendency of a criminal charge, in the same category, and it has been held that they are regarded alike for the purposes of the present question. State v. Bird, supra. This case stands alone in our jurisprudence, in that, the question was raised before the conviction of defendant; but it also stands alone, so far as we have been able to discover, in the fact that the disqualification was made known upon the examination of the juror on his voir dire, and that he was nevertheless accepted on behalf of defendant, and that no action was thereafter taken until after two days had been spent in taking the testimony of the state witnesses, when the motion was made to discharge the jury and enter a mistrial, a proceeding which, after the fourth trial which would then have been had, would perhaps have ended the prosecution.

Mr. Bishop says that, after the swearing, an objection to a juror, or the panel, "is ordinarily treated as waived." Bishop, New Cr. Pro. vol. 2, § 946. And that:

"If while it is being made up and sworn for his trial, he is aware of a cause for challenge and does not make it, he is too late afterwards. Yet—

"If the defect is unknown, he will, in some circumstances, not in all, be permitted to make the objection later. This depends on the time and manner of bringing it forward, the nature of it, his prior diligence, the jurisprudence of the particular state, and the view of the individual judge."

Id. § 932.

In the instant case, we must hold that defendant's counsel did know all about the

disqualification of the juror before he accepted him, and that it would not conduce to the proper administration of criminal justice to sustain his effort thereafter to break down the trial under the circumstances here disclosed.

[8] Bill 18 shows that, in cross-examining the defendant, the district attorney asked:

"Since when did you put on that big ring there, and by what authority are you wearing it? Isn't it your intention to escape the gallows by wearing it?"

To which counsel for defendant objected, and the court sustained the objection, and instructed the jury:

"That the question formed no part of the evidence, and to disregard the question or statement of the district attorney when they considered the case."

The bill contains the further statement that the ring bore the emblem of the Masonic Order, and that two of the jurors, white men, were members of that order.

The concluding sentence of the question was undoubtedly objectionable, and it is to be regretted that it should have been addressed by a public officer to a person occupying defendant's position; but it was not necessarily prejudicial to the case which the jury were to decide. They were instructed by the court to disregard it, and it may be presumed that they did so.

[9, 10] Bill 19 contains the recital that the district attorney, in his closing argument, referred to defendant as a "monster," which was objected to, and the objection was followed by an instruction from the judge that the jury should disregard it. The purpose of the argument was to deduce from the evidence that defendant was a murderer, and the district attorney was within his right in using a term of equivalent meaning, or a stronger term, if, in his opinion, the evidence justified it.

Bill 20 discloses an objection to the remark made by the district attorney, in argument:

"Everybody knows that the accused filed a motion for a change of venue and only objected to the case being brought to this parish."

The statement per curiam is that—

The remark was made "in answer to the argument made by counsel for defendant relative to a motion for a change of venue being filed by the state, but the objection urged by defendant was sustained, and the jury charged not to consider it in arriving at its verdict in the case. No injury to the accused is shown."

Remarks by a prosecuting officer as a necessary answer to argument for defendant, though otherwise improper, afford no ground for setting aside a verdict. State v. Satcher, 124 La. 1015, 50 South. 835.

Bills 21 and 22 no longer present live issues and are not insisted on.

[12, 13] Bill 23 was reserved to the overruling of a motion for new trial, predicated, in the main, upon alleged errors covered by the bills of exceptions. The only point included in the motion which is referred to in the brief of counsel is that defendant, having been convicted in the last preceding trial of murder, without capital punishment, cannot, as the result of the last trial, be subjected to any heavier penalty. In other words, that, by his conviction of murder without capital punishment, he was acquitted of the original charge of murder for which that punishment is imposed.

On defendant's application, by appeal to this court, not only were his conviction and sentence by the district court, sitting for the parish of Jackson, annulled, but the judgment of the district court sitting for the parish of Winn, which, by ordering the change of venue, purported to confer jurisdiction upon the court sitting for the parish of Jackson, was also annulled, and the case was restored to its status as a case pending in the dis-

trict court sitting for the parish of Winn upon a motion for change of venue. The appeal from the conviction and sentence, under the jurisprudence of this court, also brought up for review, as an interlocutory ruling in the case, the prior judgment ordering the change of venue, and it was in consequence of defendant's earnest attack upon the judgment last mentioned and insistence that it was unauthorized and illegal, that it was set aside, and the question whether the venue should be changed, and, if so, whether the case should be transferred to the parish of Jackson, reopened.

The judgment of this court reads:

"That defendant's conviction" (obtained in the district court sitting for the parish of Jackson) "be annulled; * * * that this case be remanded to the district court for the parish of Winn" (by the judgment of which, on the motion for change of venue, the district court for the parish of Jackson had assumed jurisdiction); "that the trial of the state's motion for a change of venue be reopened, to be proceeded with according to law and the views herein expressed" (which were that the judgment ordering the change of venue was unauthorized and illegal, for the reason that the evidence tendered on behalf of defendant had been excluded); "and that defendant have another trial in accordance with law." State v. Morgan, 142 La. 784, 77 South. 588.

If, then, the district court for the parish of Jackson had no jurisdiction upon the former trial in that court, to convict defendant upon the charge of murder, whether with or without capital punishment, it necessarily follows that it had no jurisdiction to acquit him upon such charge, and its action in the premises constituted no bar to the present prosecution.

"An acquittal or conviction by a justice of the peace, * * * or other court not having jurisdiction, of the offense, is not former jeopardy, and is no bar to a subsequent trial in a court which has jurisdiction." 21 Cyc. 263.

Beyond that, it appears that no plea of autre fois acquit was filed in this case, prior to the conviction, and hence no evidence was offered in support of it. Had the plea been filed, in time, and tried, it would have been necessary for defendant to show that he had been acquitted by a court having jurisdiction to acquit him. State ex rel. Williams v. Klock, 45 La. Ann. 316, 12 South. 307; State v. Bates, 38 La. Ann. 491; State v. O'Connor, 119 La. 466, 44 South. 265.

[14] Defendant's indefatigable counsel have filed a supplemental brief in which they devote considerable attention to the point, raised in the oral argument, that the transcript fails to show that defendant was arraigned. When the point was made, counsel for the prosecution produced the transcript of the former appeal, which shows the arraignment, to which it was objected that the court could not, for the purposes of the present case, take judicial notice of the contents of that transcript; and that the situation could not be changed by a motion to make it part of the transcript brought up in this case. We are inclined to think differently, but pretermit further expression of opinion upon the subject, as the counsel for the state has caused the clerk of the district court to send up an amended or supplemental transcript, showing the arraignment, which we hold to be a competent method of correcting an error of omission for which the state, as appellee, was, in no wise, responsible. Baltimore v. Parlange, 25 La. Ann. 335; Borde v. Erskine, 29 La. Ann. 822; State v. Lee, 116 La. 607, 40 South. 914.

The learned counsel also (in their supplemental brief) reargue the question of the validity of the judgment of the district court for the parish of Winn, ordering the change of venue; but that matter we think was finally disposed of by the original judgment and judgment on rehearing of this court in which the judgment ordering change of venue was set aside and the case remanded with instructions which left it open only for the

introduction of evidence concerning the public sentiment in the parish of Jackson as likely to affect defendant's right to a fair and impartial trial. It is rather late, therefore, and especially considering that both the defendant and the state have complained that such a trial could not be had in the parish of Winn, and that there have been two mistrials in that parish, to make the complaint that the evidence did not justify the transfer of the case to another parish.

[11] Another bill was reserved to the refusal of the trial judge to await the transcription of the stenographer's notes of the testimony before directing that the argument be proceeded with and the case closed. We find no merit in the bill, the more particularly as it appears that the time when the notes would be transcribed appears to have been uncertain.

Finding no reversible error therein, the judgment appealed from is affirmed.

O'NIELL, J., concurs in the decree.

PROVOSTY, J., dissents.

On Rehearing.

SOMMERVILLE, J. In the two preceding opinions in this case the court had occasion to remark upon the manner in which the case had been tried. In our opinion, no bill of exceptions, except the one numbered 9, was sufficient, in itself, upon which to base a reversal of the judgment appealed from.

[15] But in reviewing the case on this rehearing we are constrained to the opinion that defendant has not had an entirely fair trial before an impartial jury. That is, the trial was attended with so many wrongful acts and sayings that, in the aggregate, they rendered the trial unfair to the accused.

The case is a particularly difficult one. The defendant is a colored man, who was charged with and was being tried for the murder of a white man, an officer of the law, while in the discharge of his duties as sheriff of the parish of Winn. The jury was composed of white men, who, doubtless, were unprejudiced and unbiased, as was testified to by them on their examination on their voir dire. But insinuating remarks and statements contained in argument and in questions addressed to the defendant while a witness on the stand, on the part of the prosecuting officer, were well calculated, in our opinion, to prejudice the defendant in the eyes of the jurors. There were suggestions that the defendant was guilty of the crime charged against him, and that he was using ulterior means for obtaining an acquittal. It is true, in almost every instance, objection was made on behalf of defendant, and the judge sustained those objections and instructed the jury to disregard the suggestions and statements. But that is not a fair way or impartial mode of prosecuting a person charged with crime. The evidence, we are given to understand, was purely circumstantial against the defendant. Considering all the circumstances, a rehearing was granted in the case, particularly with reference to bill numbered 9, covering the testimony of the witness Teddlie, the objections thereto, and the overruling of those objections.

Defendant complains of our ruling upon the change of venue, ordered from Winn parish to Jackson, in which latter parish the case was tried. Defendant himself moved for a change of venue from Winn to a parish in an adjoining district, specially excluding Jackson parish from consideration, which was in the same district with Winn. The state afterwards moved for a change of venue from Winn to Jackson parish, and the change was ordered. We have carefully reviewed the evidence on this point, and there is no reason for changing our ruling with reference thereto. We are of the opinion of the district judge who ordered the change, that a fair and impartial trial could have been had in Jackson parish.

[16] Bill of exceptions No. 9, before referred to, contained objections made by the defendant to certain evidence brought out by the district attorney, on the ground that such evidence was hearsay and inadmissible. Another witness, Jennings, testified on the former trial of the case, and we had there ruled that his testimony was admissible to prove motive and intent on the part of the defendant in killing the sheriff. Defendant knew, to some extent, to what the witness Teddlie might testify, and therefore objected to it on the ground of being hearsay. The witness was asked to give the substance of a conversation to the jury, which he had held with the deceased some hours prior to the death of the latter. Teddlie was the first witness put on the stand by the state. The corpus delicti had not been proved. The defendant, of course, had not been a witness, and his character and reputation were not at that time an issue in the case. Teddlie, in answer to the question, said:

"I went there in the commissary that evening about 6 o'clock, don't know the time, and Mr. Howell (the deceased sheriff) asked me to go with him that night; said it was Saturday night, pay night, and he was expecting negroes in there to sell whisky, and that he was expecting to take them up if they were there. He said it was Pete Morgan and John Lewis. He said that they were two bad negroes and said that he was afraid of them. He asked me to go with him, and I told him I couldn't go with him then, but would probably go with him after a while. He said he went down there a few Saturday nights before that, and Pete Morgan was in town that night."

Objection was again made on behalf of defendant that the testimony was hearsay and immaterial; that proof of a prior difficulty could not be proved by hearsay testimony. The objection was overruled, a bill was reserved, and the witness continued as follows:

"At Green Watkin's cursing and raising sand. He said he went over and asked Morgan to hush up and behave himself; and Pete talked pretty rough to him, told him that he was no better than a negro himself, and that every time they had a supper over there that he was always around trying to associate with them, and asked him why he didn't go over among his own kind and not be trying to associate with negroes. Howell said he guessed the thing he ought to have done was just to have shot Pete, he guessed at that, but said he went on back; he was alone, and he went on back over in town. He said a few days later he went out west of Atlanta to serve some citation papers on some one, and that Pete was out there in his front yard doing some work when he rode in sight of the house, and said Pete went back in the house, quit work, and went in the house and stayed in the house until he passed, and that he came out then and went to work again. Mr. Howell went out and finished his work and he came back, and as he rode in front of the house Pete did the same thing again, went in the house and stayed in the house until he passed. Q. Then what did he want you to do? A. He said he wanted me to go down and see if I could see Pete Morgan down there, and if I could find him down there to try and buy some whisky from him. He asked me if I had any money, and I told him that I did, and he said if I didn't have any money that he had money to put up for me to buy the whisky with."

The district attorney said in argument that he did not know that the witness would relate all of the conversation which he had had with the deceased sheriff, and that he was not responsible for the incompetent evidence. He did not stop the witness when the latter went beyond the question propounded to him, and the judge did not stop him. All of the testimony went to the jury, and it should not have been admitted over the objections of the defendant.

The testimony of the witness Teddlie, to the effect that Pete Morgan was a bad negro; that the deceased was afraid of Pete; that Pete was a bootlegger; that the deceased had said that he had been at Green Watkin's a few Saturday nights before and that Morgan was cursing and raising sand; that he tried to get Pete to hush up and behave himself; that Pete talked very roughly to him, and told him (Howell) that he (Howell, a

white man) was no better than a negro, and that he was always trying to associate with negroes when they gave a supper; that he (Howell) guessed that he ought to have shot Pete at that time, etc.—was all hearsay, inadmissible, and was highly prejudicial to the accused.

We are of the opinion that the defendant has not had a fair and impartial trial, and the case will be remanded for trial.

It is therefore ordered, adjudged, and decreed that the verdict and sentence appealed from be avoided and set aside, and that this case be remanded to the district court for the parish of Jackson to be there proceeded with according to law.

MONROE, C. J., dissents and assigns reasons. See 82 South. 721.

O'NIELL, J., concurs only in the ruling that the verdict and sentence should be set aside because of the error in admitting the hearsay testimony of the witness Teddlie, referred to in bill of exception No. 9; but he is of the opinion that the ruling granting a change of venue to Jackson parish should be reversed, and the case should be remanded to Winn parish for trial there.