[Crim. No. 7263. In Bank. Nov. 19, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD KAYE HENDERSON, Defendant and Appellant.

484

Benjamin Dreyfus, under appointment by the Supreme Court, and Garry, Dreyfus & McTernan for Defendant and Appellant.

Stanley Mosk, Attorney General, and Albert W. Harris, Jr., Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—A jury found defendant guilty of murder of the first degree and fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) In a previous trial for the same offense defendant waived trial by jury and pleaded guilty to murder, which the court found to be of the first degree. The court sentenced him to life imprisonment. On defendant's appeal the District Court of Appeal reversed the judgment and remanded the case for a new trial pursuant to a stipulation of defendant and counsel for the respective parties on the ground that defendant was improperly allowed to withdraw his plea of not guilty and to enter a plea of guilty after the court had ordered defendant's counsel discharged on defendant's motion. (Pen. Code, § 1018; *People* v. *Ballentine,* 39 Cal.2d 193, 196 [246 P.2d 35].)

Defendant admitted in open court that he killed the deceased, Mrs. Joyce Lovett, in a motel in Pinole, and that he inflicted the lacerations and contusions found on her body. Defendant had previously been casually acquainted with the deceased and met her in a bar in San Jose on the evening of July 10, 1961. They had a few drinks and the deceased agreed to accompany defendant on a trip to Lake Tahoe. They left the bar about closing time and drove to a motel in El Cerrito where defendant registered them as Mr. and Mrs.

R. Henderson. The following day they went to two or three bars in El Cerrito and San Pablo where each of them drank several beers. In the afternoon they started toward Sacramento but were forced to stop in Pinole because defendant's automobile was overheated. They ate and had several more beers in Pinole. Defendant inquired at a bar about motel accomodations. A customer drove them to a motel on the edge of town where defendant again registered them as Mr. and Mrs. Henderson. They arrived at the motel about 4 o'clock in the afternoon. About half an hour later defendant killed and mutilated the deceased. At 10 o'clock that evening a motel employee gave defendant a ride downtown, and defendant drove his automobile back to the motel. Later that night he put the deceased's body in his car and after driving around for several hours put the body along the highway. Defendant then drove to his apartment in Santa Clara where he stayed the remainder of the night. The following day he confessed the killing to his half-sister and showed her the deceased's rings. After seeing a lawyer in San Jose, he agreed to turn himself in and at about 8 p.m. surrendered to the Alameda County Sheriff.

The day after the killing Dr. McNie performed an autopsy on the body of the deceased. He testified that death was caused by asphyxiation from strangulation associated with multiple blunt injuries. Dr. McNie found multiple contusions on deceased's head, neck, shoulders, arms, and legs. He found multiple small abrasions on the left breast, multiple scratches measuring up to two inches in length on the skin of the lower abdomen, a three-eights inch by one-quarter inch puncture of the skin over the pubis, and multiple wedge-shaped lacerations of the skin and mucosa of the perineum radiating outward from the rectum and vagina, the largest of which was two by one inches extending from the vagina across the urethra to the clitoris. There was a three-quarter inch laceration of the rectovaginal septum. There were six to eight lacerations in the rectal area and the rectum was dilated to 2-1/2 inches in diameter and contained deceased's wadded panties. It was Dr. McNie's opinion, based on the finding of hemorrhage into the tissues underlying the injuries, that, except for the perineal area, the injuries had been inflicted before death. Dr. McNie was not asked whether in his opinion the injuries to the perineal area occurred before or after death. He testified, however, that there were areas of hemorrhage into the underlying supporting tissues of the

rectum and vagina and into the mucosa at the edges of the lacerations. There was no evidence of sperm in the vaginal tract. A blood test disclosed .19 per cent alcohol in the deceased's bloodstream at the time of death.

Based on the condition of the body, the People requested and the trial court gave instructions defining murder of the first degree when committed by means of torture and when committed in the perpetration or attempt to perpetrate mayhem. The evidence of defendant's possession of the deceased's rings, which the physical evidence suggested had been removed before death, and his possession of the deceased's purse, support the instruction regarding a killing in the perpetration or attempt to perpetrate robbery. The circumstances of the killing and the existence of fresh scratches on defendant's face when he was arrested support the instruction that the deceased may have been killed during the perpetration or attempt to perpetrate rape.

The foregoing evidence, together with evidence tending to rebut defendant's defense of lack of malicious intent and premeditation, was the basis for the People's theory that the killing was murder of the first degree because it was willful, deliberate, and premeditated. In this regard, the man who drove defendant and the deceased from the bar in Pinole to the motel testified that defendant did not appear to be intoxicated at that time. The manager of the motel testified that when defendant registered ''he had been drinking but he wasn't inebriated.'' Both of these witnesses were also of the opinion that the deceased was not intoxicated, although the blood test disclosed that her bloodstream contained .19 per cent alcohol. To negative lack of criminal intent the People also offered the testimony of Mrs. Pauline Perez that a month before the killing defendant had committed a sexual attack upon her under circumstances similar to those surrounding the homicide.

Mrs. Perez testified that she met defendant in the same bar in San Jose in which he later met the deceased and agreed to have defendant take her home. She testified that defendant did not take her home and that when she attempted to get out of his car, he struck her and threatened to kill her if she tried it again. When they stopped, defendant drew a knife and attempted to rape her and forced her to commit an unnatural act and to submit to the commission of a similar act by him. She testified that defendant then inserted a sap into her vagina and bit her arms, legs, breasts, and stomach. He

threatened to kill her so that she could not report the incident to the police, but relented when she begged for her life. When defendant allowed her to leave the car, he kept her underclothes and purse. Mrs. Perez was taken to a hospital and the police were notified. Photographs of Mrs. Perez's injuries were introduced by the People to explain and corroborate her testimony. Defendant admitted on the stand that he performed the acts testified to by Mrs. Perez, but denied that he had a knife or that he threatened to kill her. He also denied that he threatened to kill her because she had informed on him.

Defendant does not contend that the evidence is insufficient to support a conviction of first degree murder under any or all of the theories advanced by the People. His defense is that he had no intent to harm the deceased and that he had no control over his actions because of his intoxication and mental illness not amounting to legal insanity. He testified that the mutilation of the deceased occurred after he had killed her by strangulation. He could not recall when or how he received the scratches on his face and denied that he attempted to rape the deceased or to force her to engage in any unnatural act. He testified that he took the rings from her finger after he had put the body along the highway, but he did not know why he had taken them. He did not explain his possession of the deceased's purse.

In support of his defense of intoxication, defendant testified that he drank 13 to 15 beers at various bars on the day of the killing and that he was drunk when he and the deceased arrived at the motel. He testified that after checking into the motel the deceased took a shower and as she was drying herself he walked into the bathroom, picked her up and carried her into the bedroom. He "laid her down on the bed, and then ... started to make love to her and then this strange thing come" that he described as "like watching ... yourself do something and yet unable to intercede or to stop whatever is happening. ... [Y]ou seem to be paralyzed and I could see everything was going on and, to put it bluntly, just like a dream." Defendant testified that he strangled the deceased with his hands but that before killing her he did not hit or cut her or do any other violence to her body. He testified that after he had killed her he "woke" or "came out" and realized what he had done. He carried her body into the shower and attempted to revive her with cold water. "And then I says, 'If she's as dead as she appears, who will believe

me?' So that's when I got the crazy notion and did what the other I did.'' Defendant testified that he went into the bathroom where the body was lying in a corner of the shower stall and cut the deceased's body with a beer can opener. Defendant then ''passed out'' on the bed. When he awoke, he dressed the body and left it leaning against the wall in the bathroom. About midnight he carried the body to his car and disposed of it along the highway.

This version of the killing and mutilation was substantially the same as that told to the various psychiatrists who testified at the trial. Defendant's half-sister, to whom defendant confessed the crime before surrendering to the sheriff, testified that he told her that he ''got a pain ... down here in the lower part, and it hurt, you know. Got a lot of pain and it made him black out like, and when he came to, he had a can opener in his hand and he went in [to the bathroom] ... and he looked at her and he realized he strangled her and cut her up from the bottom part with the can opener to the belly button.... [A]nd then he told me how he did it. He said that he went into the bathroom and he says he don't remember doing it, but he knows he did it. He said that he went into the bathroom and strangled her and then he—he didn't remember how he cut her up. He just cut her up. That's all. And then when he woke up on the bed, the pain was gone away, he said. That he woke up and he found the can opener in his hand. ...''

Two psychiatrists testified that because of defendant's mental state he did not premeditate before the killing. Dr. Wilcox's report, which was admitted into evidence, stated that ''I feel that this man is a borderline schizophrenic.... Despite the appearance of fairly good integration in most areas of the personality, there are many evidences of psychotic thinking. It seems to me that the murder grew directly out of his illness. The murder appeared to be an expression of his hate for women and society; also his hate for himself.. .. I feel that Mr. Henderson is psychotic and that he also is legally insane. I feel that he was insane at the time of the murder.'' Although Dr. Wilcox was unsure whether defendant could premeditate at the time of the killing, it was his opinion that defendant did not premeditate. Dr. Adams was of the opinion that at the time of the killing defendant was not capable of killing the deceased with premeditation. He testified that in light of defendant's background he was suffering from a ''severe psychologic problem ... not in a

psychotic or insane sense, but rather in the sense of a flood of emotion which has a dynamic interpretation in the background, I am sure, connected somewhere with his mother, but in any event, leading to an emotional upheaval and always in a sexual setting over which he did not have voluntary control. Therefore, I say that at the time this happened, he was again, in my opinion, a victim of this flood of emotion to the extent that he was unable to utilize normal volitional control over his actions.''

On cross-examination, both Dr. Wilcox and Dr. Adams stated that they based their opinions on what defendant had told them and that if the actual facts differed from defendant's statement of them their opinions would be different. Dr. Wilcox stated that he would question his conclusion that defendant did not premeditate if the sequence of the killing and the mutilation were reversed, as the testimony of the autopsy surgeon suggested. In response to a hypothetical question he stated that defendant was able to premeditate during the Perez incident.

In rebuttal, the People introduced the testimony of three psychiatrists who had examined defendant and concluded that he was not suffering from any mental defect that would preclude his acting with malice aforethought and premeditation when he killed the deceased. Dr. Rapaport testified that ''at the time of this alleged offense, he was conscious and aware of what he was doing. . . . He had no mental illness . . . that would have precluded him from forming intent or engage in premeditation.'' Dr. Argens found ''no evidence of mental illness as such would preclude [defendant's] . . . normal actions or ordinary actions. . . . [He found] no evidence at all of psychosis.'' Dr. Fort, who examined defendant on the day after the killing, testified that at the time of the homicide defendant ''was conscious and was not suffering from any form of mental illness or emotional disturbance that would have interfered with his capacity to premeditate.''

Defendant contends that the trial court erred in failing on its own motion to instruct the jury on the legal significance of the evidence of defendant's mental illness and in refusing to give defendant's proffered instruction on manslaughter.

''It would seem elementary that a plea of not guilty to a charge of murder puts in issue the existence of the particular mental states which are essential elements of the

two degrees of murder and of manslaughter. . . . Accordingly, it appears only fair and reasonable that defendant should be allowed to show that in fact, subjectively, he did not possess the mental state or states in issue." (*People* v. *Gorshen,* 51 Cal.2d 716, 733 [336 P.2d 492]; *People* v. *Wells,* 33 Cal.2d 330, 343-357 [202 P.2d 53].)

" 'It is *elementary* that the court should instruct the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* . . . *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. . . . That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.'* " (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].)

The People do not dispute these settled propositions of law that under a general plea to the charge of murder, evidence is admissible tending to establish a defense negating the specific mental states essential to the crime and that when such evidence is received, the defendant is entitled to an instruction apprising the jury of its significance. The People contend, however, that the trial court is not required to give such an instruction on its own motion. They argue that "The cases which have found a duty on the court to give *sua sponte* instructions have generally involved situations where the failure to give the instructions had the effect of removing from the jury a significant issue in the trial and thus failing to give to the defendant an opportunity . . . to obtain a determination by the jury of the particular issue." We think that this is such a case.

It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a "significant issue" in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. (See Lindman & McIntyre, The Mentally Disabled and the Law (1961) 355-356.) Under that rule a defendant is not insane in the eyes of the law if at the time of the crime he knew what he was doing and that it was wrong. Under the *Wells-Gorshen* rule of diminished responsibility even though a defendant be legally sane according to the M'-Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of mur-

der of the first degree. This policy is now firmly established in the law of California (*People* v. *Gorshen, supra; People* v. *Baker,* 42 Cal.2d 550, 569-571 [268 P.2d 705] ; *People* v. *Sanchez,* 35 Cal.2d 522, 526-529 [219 P.2d 9] ; *People* v. *Wells, supra; People* v. *Harris,* 29 Cal. 678, 683-684) and where, as here, substantial evidence sufficient to inform the court that defendant is relying upon the defense of diminished responsibility is received, it must on its own motion instruct the jury as to the legal significance of such evidence, for such an instruction is "necessary for the jury to be fully and fairly charged upon the relevant law." (*People* v. *Jackson,* 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937], and cases cited therein.)

 The People contend that the failure to instruct on diminished responsibility was not prejudicial because the intent and state of mind of defendant were fully developed by argument of counsel and were adequately covered by the instructions given. It is true that from the opening statement of counsel for the defense the issue of defendant's mental state at the time of the homicide was in issue. Defense counsel stated that he expected the evidence would show "exactly what the District Attorney said, that this was a sadistic murder." He added that he expected to prove from medical experts "that Mr. Henderson was suffering from such a psychosis or ... illness that he ... did not have the mind or the capability of forming a malicious or a premeditated [intent] ...." During his argument to the jury, the prosecutor referred to the psychiatric testimony and stated "this really is the defense of the defendant here: his inability to premeditate, his lack of intent." In closing argument, defense counsel urged the jury to "examine carefully what the psychiatrists have told you and what they have testified to, and I think ... that you will agree with me that this was a heinous crime. I don't argue that.... [B]ut I say to you it wasn't premeditated." He argued "in closing ... the only issue in this case is the premeditation and the intent.... I do not excuse nor condone Mr. Henderson, but I say to you he is guilty of nothing greater than murder in the second degree. ..."

We agree that in light of such extensive argument on the issue of defendant's responsibility he could not have been harmed by the failure to instruct on that issue if the jury was otherwise properly instructed on intent. The jury, however, was not properly instructed on that issue. It was in-

structed that to constitute willful, deliberate, and premeditated murder the killing must be accompanied by a clear intent to take life resulting from deliberation and formed upon a preexisting reflection and not in heat of anger, and that the slayer must weigh and consider the question of killing and the reasons for and against such choice and, having in mind the consequences, decide to and commit the unlawful act causing death. These instructions were proper, but they in-formed the jury only that a particular intent was necessary. How the jury should discover whether that intent existed was covered by the following instruction: ''The intent or intention is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused, and I further instruct you that all persons are of sound mind who are neither idiots nor lunatics nor affected with insanity to such an extent as to be unable to discern right from wrong.''

Although counsel argued and the court instructed that defendant's intent was the crucial issue in the case, the only instruction that purported to tell the jury how to determine what that intent was told them to look to the circumstances of the offense and defendant's ''sound mind'' unless they found him to be an idiot, lunatic or legally insane.

''The prejudicial nature of the instruction appears most clearly in the difficulties that it creates for the jury in the application of the rule ... that evidence of a mental infirmity, not amounting to legal insanity, is admissible and should be considered by the jury on the questions of premeditation and deliberation. If the defendant has a 'sound mind,' that is 'a healthy and robust mind, neither diseased nor injured,' it necessarily follows that he would not have a mental infirmity making him incapable of premeditating or deliberating.'' (*People* v. *Baker*, 42 Cal.2d 550, 569 [268 P.2d 705].)

Defendant admitted that he killed and mutilated the deceased. These were the major ''circumstances connected with the offense'' from which the jury was instructed it could infer defendant's intent. His sole defense was diminished responsibility because of his ''unsound'' though not insane mind, and this defense was withdrawn from the jury by the court's instruction that defendant was of sound mind if he was not an idiot, lunatic or legally insane. There could be no question of defendant's legal insanity during the trial of his guilt or innocence since that issue was to be determined on the separate proceeding under his plea of not guilty by rea-

son of insanity, which was not withdrawn until the conclusion of the trial on the issue of guilt. Under these circumstances, defendant is "conclusively presumed to have been sane at the time the offense is alleged to have been committed." (Pen. Code, § 1026.) There was no evidence that defendant was a lunatic or an idiot within the ordinary meaning of those words. Based on the only criteria it was given, the jury could only have found that defendant was of "sound mind." The effect of the instruction that defendant was of sound mind together with the failure to instruct on the significance of his defense of diminished responsibility was to withdraw from the jury all consideration of the evidence introduced in support of that defense. Such evidence, although disputed, was considerable. There was no evidence that defendant intended to kill the deceased at any time before registering at the motel, and the autopsy surgeon's report and defendant's testimony agree that death occurred shortly thereafter. That defendant theretofore had no premeditated intent to kill is attested to by the prosecution witnesses who testified as to the conduct of defendant and the deceased at every point between their meeting in San Jose and the motel in Pinole. Although the half hour that elapsed between the registering and the killing was sufficient for defendant to form a willful, deliberate, and premeditated intent to kill, the evidence does not compel that conclusion. Although the circumstances of the killing and the condition of the deceased's body would warrant a conclusion that the killing was premeditated, they also suggest that the perpetrator of such a killing and mutilation was deranged. Defendant testified that he had no intention to kill the deceased and that the act was done while he was in a dream-like state. Two psychiatrists testified in corroboration of this explanation of the killing. We do not overlook the testimony of the autopsy surgeon that the mutilation occurred before the killing, and we are aware of the damaging effect of this testimony, if true, upon defendant's defense. That testimony, however, is not without equivocation. Dr. McNie consistently responded to questions regarding the relationship of the wounds to death by stating that he "felt" that they were inflicted before death. The jury was instructed that it could disregard or give such weight as it thought warranted to expert testimony. Accordingly, it was entitled to disregard an expert's "feeling" concerning evidence within his competence to interpret. It follows that the jury could have concluded that

defendant was telling the truth about the sequence of events and his intent at the time they occurred. It could have concluded that defendant's experts were not discredited on the ground that their opinions were based on an erroneous view of the circumstances. If the jury so concluded, it could not have found defendant guilty of murder in the commission of mayhem or by torture. The evidence that defendant killed during the course of rape or an attempt to rape was wholly circumstantial and inconsistent with the evidence that deceased willingly accompanied defendant to the motel and willingly engaged in sexual intercourse with him during their stay in the first motel. Although defendant had deceased's rings and purse in his possession after the killing, that was the only evidence that the deceased was killed during the course of a robbery. There is no evidence that if an intent to take her property existed, it arose before the completion of the homicide. The vice of the instruction is that even if the jury found no murder by torture or killing during the course of mayhem, rape, or robbery, it was barred from considering defendant's sole defense of diminished responsibility by the court's direction that defendant was of "sound mind." The error was aggravated by the court's failure to give any instruction that told the jury for what purpose they could consider the evidence of that defense.

Since defendant was deprived of the right to a jury determination of the only real issue in the case, the conviction must be reversed, for the denial of such a right itself is a miscarriage of justice within the meaning of article VI, section 4½, of the Constitution. (*People* v. *McKay,* 37 Cal.2d 792, 798 [236 P.2d 145] ; *People* v. *Sarazzawski,* 27 Cal.2d 7, 11 [161 P.2d 934] ; *People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607].)

Since the judgment must be reversed, we shall consider other contentions that may arise on retrial.

 Defendant's contention that the trial court erred in admitting into evidence over objection the testimony of Mrs. Pauline Perez that defendant had attacked her sexually a month before the killing is devoid of merit. It was clearly admissible to prove, as the jury was instructed, defendant's motive for killing the deceased and the intent with which the act was done. "It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material

fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge." (*People* v. *Woods,* 35 Cal.2d 504, 509 [218 P.2d 981]; *People* v. *Weitz,* 42 Cal.2d 338, 347 [267 P.2d 295].) The evidence was relevant on the issues for which it was received. ▊ Although evidence of prior offenses carries with it the risk that its probative value may be outweighed by its possible prejudicial effect, evaluation of this risk rests in the sound discretion of the trial court. (*People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974].) ▊ We find no abuse of discretion in the admission of Mrs. Perez's testimony.

▊ Defendant also contends that the trial court erred in admitting photographs of Mrs. Perez's injuries, on the ground that they served solely to inflame the jury. ▊ When allegedly inflammatory photographs are presented, the trial court must determine their admissiblity in light of their probative value, other evidence on the issue, and their possible prejudice to the defendant. (*People* v. *Love,* 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Atchley,* 53 Cal.2d 160, 168 [346 P.2d 764]; *People* v. *Brubaker,* 53 Cal.2d 37, 48 [346 P.2d 8].) ▊ We find no abuse of discretion in the admission of the photographs.

▊ Defendant contends that the prohibition against double jeopardy precludes imposing the death sentence after reversal of the first judgment sentencing him to life imprisonment. Article I, section 13, of the California Constitution provides that "No person shall be twice put in jeopardy for the same offense...." It states a fundamental principle limiting the state's right repeatedly to prosecute a defendant. It is not an absolute prohibition, for although jeopardy may have attached, legal necessity or the real or implied consent of the defendant permits a retrial. (*Paulson* v. *Superior Court,* 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641], and cases cited.) In the present case, we must determine the extent to which a defendant who attacks an erroneous conviction thereby opens the door to being again placed in jeopardy.

He does not gain immunity, for by successfully attacking the judgment he at least subjects himself to a retrial that may reach the same result. (*United States* v. *Ball,* 163 U.S. 662, 672 [16 S.Ct. 1192, 41 L.Ed. 300, 303]; *People* v. *Green,* 47 Cal.2d 209, 235 [302 P.2d 307].) There is a sharp conflict in the cases, however, whether such an attack opens the door to the imposition of a more severe sentence on retrial. (See

cases collected in 61 A.L.R.2d 1141-1216.) The question usually arises when a defendant has successfully attacked a conviction of a lesser included offense or a conviction of a lower degree of the crime charged.

Before this court's decision in *Gomez* v. *Superior Court,* 50 Cal.2d 640 [328 P.2d 976], there was a curious distinction between a conviction of a lesser included offense and a conviction of a lesser degree of a crime divided into degrees. A conviction of a lesser included offense was deemed a final acquittal of the offense charged, which was not affected by a subsequent reversal of the conviction. (*In re Hess,* 45 Cal.2d 171, 176 [288 P.2d 5], and cases cited.) A conviction of the lesser degree of a crime divided into degrees was not deemed an acquittal of guilt of the higher degree, and after reversal the defendant could be convicted of the higher degree on retrial. (*People* v. *Keefer,* 65 Cal. 232, 235 [3 P. 818]; *People* v. *McNeer,* 14 Cal.App.2d 22, 30 [57 P.2d 1018].) In the *Gomez* case, however, we found this distinction to be logically indefensible and held that the double jeopardy clause precluded convicting a defendant of a higher degree of a crime after he had secured reversal of his conviction of the lower degree. In *Green* v. *United States,* 355 U.S. 184 [78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119], the United States Supreme Court reached the same conclusion with regard to a conviction of first degree murder after reversal of a conviction of second degree murder. In holding that a defendant is not required to elect between suffering an erroneous conviction to stand unchallenged and appealing therefrom at the cost of forfeiting a valid defense to the greater offense, we agreed with the reasoning in the *Green* case, that " 'a defendant faced with such a "choice" takes a "desperate chance" in securing the reversal of the erroneous conviction. The law should not, and in our judgment does not, place the defendant in such an incredible dilemma.' " (*Gomez* v. *Superior Court,* 50 Cal.2d 640, 651-652 [328 P.2d 976].) This reasoning applies with equal force to the present case.

The Attorney General contends, however, that under the double jeopardy clause in the United States Constitution and the California Constitution the death penalty can be imposed on a conviction of first degree murder following reversal of a conviction for the same offense with punishment fixed at life imprisonment. (*Stroud* v. *United States,* 251 U.S. 15, 18 [40 S.Ct. 50, 64 L.Ed. 103, 110]; *People* v. *Grill,* 151 Cal. 592, 598 [91 P. 515]; see also, *State* v. *Kneeskern,* 303 Iowa 929

[210 N.W. 465, 473]; *State* v. *Morgan,* 145 La. 585 [82 So. 711, 719]; *Mann* v. *State,* 23 Fla. 610 [3 So. 207, 211]; *Greer* v. *State,* 62 Tenn. (3 Baxt.) 321, 323-325.) When *Stroud* v. *United States* and *People* v. *Grill* were decided, it had been held by the United States Supreme Court and by this court that a reversed conviction of a lesser degree of a crime did not preclude conviction of the higher degree on retrial. (*Trono* v. *United States,* 199 U.S. 521, 533-534 [26 S.Ct. 121, 50 L.Ed. 292, 296-297]; *People* v. *Keefer,* 65 Cal. 232, 235 [3 P. 818].) A fortiori that rule would apply to different punishments for the same crime. Since the *Green* and *Gomez* cases have now established that a reversed conviction of a lesser degree of a crime precludes conviction of a higher degree on retrial, the rationale of the *Stroud* and *Grill* cases has been vitiated. It is immaterial to the basic purpose of the constitutional provision against double jeopardy whether the Legislature divides a crime into different degrees carrying different punishments or allows the court or jury to fix different punishments for the same crime. Thus, Mr. Justice Frankfurter dissented in the *Green* case arguing that the Court's decision in *Stroud* v. *United States, supra,* controlled the decision: ''As a practical matter, and on any basis of human values, it is scarcely possible to distinguish a case in which the defendant is convicted of a greater offense from the one in which he is convicted of an offense that has the same name as that of which he was previously convicted but carries a significantly different punishment, namely death rather than imprisonment.'' (355 U.S. 184, 198 at p. 213 [2 L.Ed.2d 199, 210 at p. 219, 61 A.L.R.2d 1119, 1130 at p. 1138].) Agreeing with Mr. Justice Frankfurter's reasoning, we overrule *People* v. *Grill,* 151 Cal.592 [91 P. 515]. A defendant's right of appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to invoke that right. Since the state has no interest in preserving erroneous judgments, it has no interest in foreclosing appeals. therefrom by imposing unreasonable conditions on the right to appeal.

The judgment is reversed.

Gibson, C. J., Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—In dissenting I stress above all other considerations, however serious they are, my objections to the

majority's holding (*ante*, pp. 495 - 497) that the prohibition against double jeopardy (Cal. Const., art. I, § 13; Pen. Code, §§ 687, 1023) forbids the trier of fact to impose a death sentence on a defendant convicted on retrial of first degree murder after reversal on appeal[1] of a judgment sentencing him to life imprisonment for the same offense, following his previous waiver of jury trial and plea of guilty. The record of the second trial is replete with evidence, material to both guilt and penalty, which had not been adduced at the first proceeding because of such waiver and plea.

The subject majority ruling is wholly without support in the decisions of this or any other court, and indeed is directly contrary to the holdings of the United States Supreme Court (*Stroud* v. *United States* (1919) 251 U.S. 15, 18 [40 S.Ct. 50, 64 L.Ed. 103, 110]; see also *Murphy* v. *Massachusetts* (1900) 177 U.S. 155 [20 S.Ct. 639, 44 L.Ed. 711]) and of every state court (including the Supreme Court of California) that has had occasion to rule on the matter (*People* v. *Grill* (1907) 151 Cal. 592, 598 [91 P. 515]; *State* v. *Kneeskern* (1926) 303 Iowa 929 [210 N.W. 465]; *State* v. *Morgan* (1919) 145 La. 585 [82 So. 711]; *Mann* v. *State* (1887) 23 Fla. 610 [3 So. 207]; *Greer* v. *State* (1874) 62 Tenn. (3 Baxt.) 321). As will hereinafter be shown, the latter holdings remain good law and have not been "vitiated" (as the majority argue) by subsequent decision on essentially distinguishable issues.

There is no doubt, as the majority acknowledge (*ante*, p. 495), that after reversal on appeal the prohibition against double jeopardy does not prevent a retrial whereby the defendant can legally be convicted of the same offense as that of which he was originally found guilty. Penal Code section 1180 specifies that "The granting of a new trial places the parties in the same position as if no trial had been had. All the testimony must be produced anew, and the former verdict or finding cannot be used or referred to, either in evidence or in argument, or be pleaded in bar of any conviction which might have been had under the accusatory pleading." Thus there will be a retrial in the case at bench (§ 1262), and upon such trial defendant can again be convicted of murder in the first degree. (*United States* v. *Ball* (1896) 163 U.S.

---

[1]Here the reversal was by stipulation of the parties, signed by the defendant, by his attorney, and by the Attorney General. The unusual circumstances (contrived by defendant) which led to its execution are hereinafter delineated.

662, 672 [16 S.Ct. 1192, 41 L.Ed. 300].) If he should be so convicted, it would be the statutory duty of the trial court to comply with Penal Code section 190, which prescribes that "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the court or jury trying the same, and *the matter of punishment shall be determined as provided in section 190.1. . . ."* (Italics added.) The latter section declares in relevant part that "If such person has been found guilty of an offense punishable by life imprisonment or death, ... there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. ... The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented ...." But under the present ruling of the majority the trier of fact will actually have no discretion in such proceedings other than to fix the punishment at life imprisonment. Indeed, even if wholly different evidence were to be introduced on the retrial of the penalty issue,[2] the trier of fact *could give no effect to such evidence* but would be mechanically bound by the finding made on other evidence and by a different trier of fact in the first proceeding. The subject holding thus amounts to a judicial aborgation of the relevant portions of Penal Code sections 190 and 190.1: In cases such as the one before us it will be futile to comply with the statutory command that "there shall thereupon be further proceedings on the issue of penalty," as the determination of that issue will no longer "be in the discretion of the court or jury trying the issue of fact on the evidence presented" (Pen. Code, § 190.1).

Analysis discloses only two arguments that can conceivably be advanced in support of today's majority holding on double jeopardy: i.e., either (1) the prohibition against double jeopardy applies because in the first *penalty* trial[3] the trier of fact impliedly "acquitted" defendant of that "degree" of first degree murder that warrants the death penalty, by

---

[2]Here, as has been already mentioned, the record on the retrial—the only trial where guilt was at issue—is replete with evidence, material to both guilt and penalty, which had not been adduced at the first proceeding because of defendant's waiver of jury trial and plea of guilty.

[3]It can only be on the first *penalty* trial that the majority hold defendant was "acquitted" of the type of first degree murder that warrants the death penalty, because defendant pleaded guilty to the charge as laid.

finding him "guilty" of another "degree" of first degree murder that warrants only life imprisonment; or (2) the prohibition against double jeopardy relates not only to the *offense* of which the defendant was "acquitted" but also the *punishment* imposed for the offense of which he was convicted (and for which he can be retried). Each of these arguments, as will be shown in turn, is an absurdity.

The first argument has nowhere been better stated than by this court in *People* v. *Grill* (1907) *supra*, 151 Cal. 592, 598: "It is now claimed that where there is a charge of murder of the first degree and a conviction of murder of the first degree with the penalty of imprisonment for life such judgment is a virtual acquittal of the character of murder sufficiently atrocious to justify the death penalty and is a bar to the infliction of the death penalty upon a retrial of the same charge." The argument thus assumes that there are two "degrees" or grades of first degree murder, one being "sufficiently atrocious to justify the death penalty" and the other being, presumably, not "sufficiently atrocious." A complete refutation of this argument and its assumption is set forth in *Grill* (*ibid.*), as follows: "The discretion given to the jury to mitigate the punishment upon a conviction of murder in the first degree, and inflict imprisonment for life only, *does not, after such a verdict, divide that degree of murder into two degrees,* but merely reduces the punishment. The mere substitution of imprisonment for life for the death penalty *is not a determination that any element of murder of the first degree is lacking.* On the contrary, such a verdict cannot be given until all the facts necessary to constitute that degree of murder are established. The former conviction was not an acquittal of the first degree of murder *nor of any degree thereof."* (Italics added.) Likewise, the United States Supreme Court observed in *Stroud* v. *United States* (1919) *supra*, 251 U.S. 15, 18 [40 S.Ct. 50, 64 L.Ed. 103, 110], that "The fact that the jury may thus mitigate the punishment to imprisonment for life did not render the conviction less than one for first degree murder."

The majority seek to circumvent the holdings of *Stroud* and *Grill* by asserting (*ante*, p. 497) that "Since the *Green* [*Green* v. *United States* (1957) 355 U.S. 184 (78 S. Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 119)] and *Gomez* [*Gomez* v. *Superior Court* (1958) 50 Cal.2d 640 (328 P.2d 976)] cases have now established that a reversed conviction of a lesser degree of a crime precludes conviction of a higher de-

gree on retrial, *the rationale of the Stroud and Grill cases has been vitiated."* (Italics added.) That the emphasized language is a total *non sequitur* appears from the face of the opinions themselves. Both *Green* and *Gomez* dealt with the problem of whether the prohibition against double jeopardy precludes retrial for a higher degree of an offense after reversal of a conviction of a lower degree. In the case at bench, by contrast, defendant has been convicted of only one offense, first degree murder; as just explained, the jury's determination of penalty (or the court's determination as in the first trial here) does not divide first degree murder into two further "degrees" or grades.

It is true that in *Grill* (at p. 598 of 151 Cal.) this court adverted in passing to the fact that (as of that date) "It has been held that a conviction of murder of the second degree upon the trial of a charge of murder of the first degree is no bar to a subsequent conviction of the higher degree upon a retrial of the same case granted upon defendant's motion," citing *inter alia People* v. *Keefer* (1884) 65 Cal. 232, 235 [3 P. 818]. But the court then observed, "Upon this exact point we need express no opinion," and immediately went on to dispose of the issue of double jeopardy on the unrelated but wholly adequate rationale quoted hereinabove. The *Keefer* rule was abandoned in *Gomez;* but since that rule was unnecessary to the decision in *Grill*—and reliance thereon was expressly disavowed in the above quoted language of the *Grill* opinion—it is manifest that *Gomez* neither overruled *Grill* by implication nor in any way "vitiated" its true rationale.

Similarly, it is manifest that the rationale of *Stroud* was not "vitiated" by the decision in *Green.* While the *Green* case cast doubt upon *Trono* v. *United States* (1905) 199 U.S. 521 [26 S.Ct. 121, 50 L.Ed. 292], cited in *Stroud,* the court in *Green* nevertheless took pains to declare (at p. 195, fn. 15, of 355 U.S. [2 L.Ed.2d at p. 208, 61 A.L.R.2d at p. 1128]: *"Stroud* v. *United States,* 251 U.S. 15 [40 S.Ct. 50, 64 L.Ed. 103], is clearly distinguishable. In that case [as in the case at bench] a defendant was retried for first degree murder after he had successfully asked an appellate court to set aside a prior conviction for that same offense." It appears to me somewhat presumptuous for the majority of this court to assert that *Stroud* was "vitiated" by *Green* when the United States Supreme Court itself states in the latter deci-

sion that *Stroud* "is clearly distinguishable."[4]

This brings me to the second possible argument in support of the majority's holding—i.e., that the prohibition against double jeopardy relates also to the *punishment* imposed for the offense of which the defendant was convicted (and for which, after reversal on appeal, he can be retried). Ignoring the lines drawn by the high court in *Green*, the majority further assert (*ante*, p. 497) that "It is immaterial to the basic purpose of the constitutional provision against double jeopardy whether the Legislature divides a crime into different degrees carrying different punishments or allows the court or jury to fix different punishments for the same crime." No authority is cited for this sweeping statement, nor can any be found. It represents a misreading or disregard of both *Green* and *Gomez,* which stand for the basic proposition that under the law of double jeopardy a defendant cannot be said to have waived his implied acquittal on one offense in order to exercise his right to appeal from his conviction on another offense, *regardless of whether the distinction between the offenses as set forth in the penal statutes* is expressed by means of different names (e.g., manslaughter and murder) or by means of different degrees of a crime bearing one name (e.g., first degree murder and second degree murder). The fallacy inherent in the majority's attempted analogy is simple. It overlooks the fundamental principle that even though different degrees of a crime may refer to a common name (e.g., murder), *each of those degrees is in fact a different offense, requiring proof of different elements for conviction.* This truth was well grasped by the court in

---

[4]It is also a quite novel claim of precedent for the majority to "agree with" Mr. Justice Frankfurter's argument on this point (*ante,* p. 497) while at the same time rejecting in effect the entire substance of his dissenting opinion, in which he was joined by three other members of the high court (355 U.S. at pp. 198-219 [2 L.Ed.2d at pp. 210-222, 61 A.L.R.2d at p. 1128]). It is noteworthy, for example, that the majority do not choose to quote the following passage from Justice Frankfurter's opinion: "We should not be so unmindful, even when constitutional questions are involved, of the principle of *stare decisis,* by whose circumspect observance the wisdom of this Court as an institution transcending the moment can alone be brought to bear on the difficult problems that confront us. ... [W]e are not here called upon to weigh considerations generated by changing concepts as to minimum standards of fairness, which interpretation of the Due Process Clause inevitably requires. Instead, the defense of double jeopardy is involved, whose contours are the product of history." (355 U.S. at p. 215 [2 L.Ed.2d at p. 220, 61 A.L.R.2d at pp. 1138, 1139].)

*Gomez* (at p. 645 [2] of 50 Cal.2d), where it was stated that "The elements necessary for first degree murder differ from those of second degree murder .... A jury impliedly decides that the necessary element of the greater crime is lacking under the evidence and returns a verdict finding the defendant guilty of the lesser degree." And given the fact that different degrees constitute different offenses, it is not suprising that they carry different punishments. The majority's emphasis on such difference in punishments is, therefore, both misleading and without substance.

Moreover, contrary to the majority's assertion, the authorities demonstrate that the distinction between degrees of crime and difference in punishment is not "immaterial to the basic purpose of the constitutional provision against double jeopardy." Although the majority do not restate that "basic purpose," I assume it to be as set forth in *Gomez* (at p. 644 [2] of 50 Cal.2d, quoting from *Green* v. *United States* (1957) *supra,* 355 U.S. 184, 187-188 [78 S.Ct. 221, 2 L.Ed.2d 199, 204, 61 A.L.R.2d 1119, 1124]): "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed *to make repeated attempts to convict an individual for an alleged offense,* thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." (Italics added.) The limitation of the protection to repeated trials for "the same offense" is not accidental; it is obedient to the express language of the constitutional and statutory mandates. Thus the Fifth Amendment to the United States Constitution declares that "No person shall ... be subject for *the same offence* to be twice put in jeopardy of life or limb." Article I, section 13, of the California Constitution likewise provides that "No person shall be twice put in jeopardy for *the same offense.*" And the Penal Code sections which restate and implement the constitutional command (§§ 687, 1023) are also phrased in terms of jeopardy for the same "offense." (See also Pen. Code, §§ 999, 1022, 1387.)

Under the foregoing provisions this court has consistently held that the prohibition against double jeopardy does not apply to the issue of *punishment.* Thus in reversing a judgment of death insofar as it related to the question of penalty we held (*People* v. *Green* (1956) 47 Cal.2d 209, 235 [14]

[302 P.2d 307] that "Inasmuch as the original sentence is set aside at the behest of the defendant it cannot be successfully pleaded as constituting former jeopardy and there is no denial of due process. [Citations.]" (Accord, *People* v. *Hooton* (1959) 53 Cal.2d 85, 88 [3]—89 [4] [346 P.2d 199].) As the United States Supreme Court declared in the leading case of *United States* v. *Ball* (1896) 163 U.S. 662, 669 [16 S.Ct. 1192, 41 L.Ed. 300] (cited in the majority opinion *ante,* at p. 495) : "The prohibition is not against being twice punished,[5] but against being twice put in jeopardy;..." That same court has held, more particularly, that a defendant is not twice put in jeopardy when, after reversal of his sentence on an appeal taken by him, his punishment is *increased* for the same offense. (*Murphy* v. *Massachusetts* (1900) 177 U.S. 155 [20 S.Ct. 639, 44 L.Ed. 711] [affirming judgment which increased defendant's minimum sentence, after appeal, from 10 years to 12½ years imprisonment].)

Lest it be thought that *Green* v. *United States* (1957) *supra,* 355 U.S. 184 [78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119], has necessarily "vitiated" the holding in *Murphy* as well, it is appropriate to consider two recent decisions of distinguished state courts on this issue, each postdating *Green* by some five years. In *Hicks* v. *Commonwealth* (1962) (Mass.) 185 N.E.2d 739, the defendant pleaded guilty to four indictments of armed robbery and was sentenced to concurrent terms of 15 to 20 years imprisonment on each indictment. The defendant appealed, exercising his statutory right to a review of the sentences (Mass. Gen. Laws, ch. 278, §§ 28A-28D). The Appellate Division, after hearing, ordered the defendant's sentences *increased* to concurrent terms of 20 to 25 years imprisonment. The defendant then appealed to the Supreme Judicial Court of Massachusetts, arguing that "the increase of the sentences placed him in jeopardy for the second time" in contravention of the constitutional guarantees. The court rejected this contention, reasoning that "It has been held repeatedly by this court and by the Supreme Court of the United States that a defendant can be tried a second time for an offence when his prior conviction for that offence has been set aside on his appeal. [Citations.] Had the

---

[5]It may be noted that in California a statute, not based on the constitutional mandate against double jeopardy, independently proscribes double punishment for the same "act or omission." (Pen. Code, § 654; *People* v. *Tideman* (1962) 57 Cal.2d 574, 578 [2] [21 Cal.Rptr. 207, 370 P.2d 1007].)

[defendant] been convicted and sentenced and if on his appeal the conviction had been reversed, a subsequent conviction followed by a longer sentence than the one initially imposed would not be objectionable." (185 N.E.2d at p. 740 [1-2].) On all fours with *Hicks* is *Kohlfuss* v. *Warden of Connecticut State Prison* (1962) 149 Conn. 692 [183 A.2d 626], in which the Supreme Court of Errors of Connecticut held that a defendant had not been subjected to double jeopardy when the minimum term of imprisonment specified in his sentence was ordered increased in a review thereof sought by him. The court in its opinion relied on *Stroud* v. *United States* (1919) *supra,* 251 U.S. 15 [40 S.Ct. 50, 64 L.Ed. 103], and *Murphy* v. *Massachusetts* (1900) *supra,* 177 U.S. 155 [20 S.Ct. 639, 44 L.Ed. 711], and dismissed *Green* v. *United States* (1957) *supra,* 355 U.S. 184 [78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119], as being "clearly distinguishable from the case at bar." (183 A.2d at p. 628 [4].) It is established in California by both statutes and decisional law that "The prosecution . . . commences when the indictment or information is filed in the superior court and normally continues until . . . the accused is 'brought to trial and punishment' or is acquitted." (*People* v. *Tideman* (1962) *supra,* 57 Cal.2d 574, 579 [5]; Pen. Code, §§ 682, 683.) The granting of a new trial reopens the criminal action for all purposes; upon the new trial (unless trial by jury is waived) the discretion of the jury in the selection of the penalty is absolute. (*People* v. *Green* (1956) 47 Cal.2d 209, 218 [7], 229 [302 P.2d 307]; *People* v. *Friend* (1957) 47 Cal.2d 749, 764-765 [11] [306 P.2d 463].)

The consequences of the majority's radical departure from established law and practice should be frankly faced. The most immediate of these is that a new category of "automatic" appeals has been carved out by judicial decision, for all defendants convicted of first degree murder and sentenced to life imprisonment will hereafter have everything to gain and nothing to lose by prosecuting review of their judgments at the public expense no matter how frivolous and insubstantial their grounds of appeal may be. Even more serious, however, will be the effect of the majority's holding on established sentencing practices of our trial courts. Until today it had never been thought that when a judgment of conviction was reversed at the defendant's behest, the former sentence or disposition in any way tied the hands of the trial judge in sentencing the defendant on a new judgment of conviction

for the same offense rendered upon retrial. Thus when a defendant is convicted of one of the many offenses punishable either as a felony or as a misdemeanor (see Pen. Code, § 17) and is sentenced as a misdemeanant, the trial judge on a new conviction after reversal on appeal may sentence the defendant as a felon for the same offense. When a defendant is convicted of a misdemeanor and a fine is imposed in lieu of confinement in county jail, the trial judge on a new conviction of the same offense after reversal may instead sentence the defendant to jail or to both a fine and jail (Pen. Code, § 19; see also § 672). When a defendant is convicted of two or more offenses at the same trial and the judgment directs that the sentences shall be served concurrently (Pen. Code, § 669), the trial judge on new convictions of the same offenses after reversal may direct that the same sentences shall be served consecutively. And when a convicted defendant is granted probation, then appeals and secures a reversal of the cause, the trial judge on a new conviction for the same offense may deny probation and sentence the defendant to a term of imprisonment.

Each of the foregoing propositions has long been part of the settled law and practice of the trial courts of this state. Each is now upset by the majority's holding (*ante*, p. 497) that the prohibition against double jeopardy applies in cases where the law "allows the court or jury to fix different punishments for the same crime." If these practices have not been affected by today's decision, it can only be because the majority have decided that in California there is to be one criminal law for death penalty cases and another criminal law for all other cases. Such an unspoken discrimination is without rational foundation and would in effect be grossly unfair to the vast majority of defendants not on trial for their lives—and to the public at large in California who are entitled to the firm enforcement of laws enacted for their protection.

The mention of the public at large—the seemingly forgotten law-abiding members of society—brings me to another phase of this case, the presentation of which requires some augmentation of the facts beyond those indicated by the majority.

In the first place it may be noted that this defendant was not in any sense a victim of overreaching by the trial court or the prosecutor. Rather, it appears the defendant—apparently aided by study of the Penal Code and other sources of

legal lore—schemed his way to a new trial. As to his waiver of a jury at the first trial, his plea of guilty, his discharge of court-appointed counsel, and his procuring of a new trial by stipulation, the record shows items and entries as hereinafter summarized or quoted.

After having been indicted for murder defendant was provided with two attorneys; he asked for trial "on the issue of present sanity pursuant to section 1368, Penal Code" and four eminent psychiatrists were appointed (two designated to be "on behalf of the defendant") to "examine said defendant as to his present sanity." Trial by jury on this issue was waived by both defendant and the district attorney; the reports of the doctors and testimonies of various witnesses including the defendant were received, and the court (Martin E. Rothenberg, Judge) found that defendant was sane and able to cooperate with his counsel. Thereafter defendant entered pleas of not guilty and not guilty by reason of insanity, and four psychiatrists were appointed "to examine . . . and determine whether . . . defendant was sane at the time of the commission of the crime, and render a report . . . and to testify as to the mental condition of said defendant. . . ."

On January 16, 1962, the time fixed for trial, defendant appeared with his attorneys before Judge Hugh H. Donovan, waived a jury and consented "that the Court determine his guilt or innocence and if found guilty, the Court to determine the degree of the offense." Evidence was received, including the reports of six doctors, the transcript of the Grand Jury proceedings and various photographs. The trial was then ordered continued to Monday, January 22, 1962.

On Thursday, January 18, however, the record shows that defendant with his two attorneys, and the district attorney and his deputy, appeared and the following minute orders were made:

1. Minutes of Thursday, January 18, 1962, 9:30 a.m., Hon. Hugh H. Donovan, Judge.

"The defendant with his counsel William Kretzmer and Theodore Forurio [sic] and the District Attorney John Nejedly and Deputy District Attorney Daniel Boatwright appear in open Court at this time, and the Court fixes this as the time for hearing the defendant's motion.

"Thereupon the defendant moves the Court to discharge the Court appointed attorneys and the defendant was duly advised of his legal rights to be represented by self-employed

attorneys and the Court orders William Kretzmer and Theodore Foruria, heretofore appointed by the Court, discharged in this case.

"*It is further ordered by the Court that said court appointed counsel be present at the further trial of this case on January 22, 1962 at 1:30 o'clock p.m. to assist the defendant in any way he may call upon them so to do.* [Italics added.]

"Upon motion of defendant, it is by the Court ordered that copies of documents received into evidence, consisting of doctors' reports, testimony at Grand Jury hearing and the list of evidence submitted to the Court, be transmitted to defendant.

"The defendant is remanded to the custody of the Sheriff."

2. Minutes of Monday, January 22, 1962, 9:15 a.m., Hon. Hugh H. Donovan, Judge.

"The defendant in pro pers and the District Attorney and Daniel Boatwright, Deputy District Attorney appear in open Court at this time, this being the time fixed by the Court for the further trial of this cause. *William Kretzmer appears in open Court at this time in compliance with the order of the Court.* [Italics added.]

"Thereupon the defendant waives further argument in this cause and withdraws his pleas heretofore entered and now enters a plea of guilty of Violation of Section 187, California Penal Code as charged in the Indictment.

"The defendant waives argument as to the degree of the charge herein and states that he has no legal cause to show why judgment should not be pronounced at this time and no sufficient cause being shown or appearing to the Court, the Court thereupon renders its judgment;

"Thereupon the Court fixes the degree of the offense charged in the indictment as first degree murder;

"It is therefore ordered, adjudged and decreed that the said Ronald Kaye Henderson is guilty of the crime of Violation of Section 187, California Penal Code (Murder, first degree) and that he be punished by imprisonment in the California State Prison for life.

"Defendant is remanded to the custody of the Sheriff for delivery into the custody of the Director of Corrections at the California Medical Facility at Vacaville, California.

"It is further ordered by the Court that the time for fixing the fee of counsel William Kretzmer, heretofore, appointed by the Court to represent the defendant in this cause, be set

for Wednesday, January 31, 1962 at 9:30 o'clock a.m.[6]
"IN THE SUPERIOR COURT OF CONTRA COSTA
COUNTY — STATE OF CALIFORNIA
 January 22, 1962
 "Present, Hon. Hugh H. Donovan, Judge
 No. 7605
"THE PEOPLE OF THE STATE
 OF CALIFORNIA Convicted of Violation
 VS of Section 187, Penal
"RONALD KAYE HENDERSON, Code (Murder)
 Defendant

"The District Attorney, with the defendant came into Court. The defendant was duly informed by the Court of the indictment found against him on the 11th day of September A.D., 1961, for the crime of Violation of Section 187, California Penal Code (Murder); of his arraignment on September 18, 1961 and of the appointment of psychiatrists to make an examination and report as to the defendant's sanity; of his trial by Court as to the defendant's sanity and the findings of the Court on November 13, 1961 that defendant is sane; and of his plea of Not Guilty and Not Guilty by reason of insanity; and of his trial by Court on January 16, 1962 and of his withdrawal of pleas heretofore entered and of his plea of 'Guilty of the Offense Charged'; on the 22nd day of January 1962 to-wit: Guilty of the crime of Violation of Section 187, California Penal Code (Murder) and of the Court fixing the degree of the offense on January 22, 1962, to-wit: Murder in the first degree.

"The defendant was then asked if he had any legal cause to show why judgment should not be pronounced against him to which he replies that he had none. And no sufficient cause being shown or appearing to the Court, thereupon the Court renders its judgment:

"That whereas the said Ronald Kaye Henderson having been duly convicted in this Court of the crime of Violation of Section 187, California Penal Code (Murder, first degree).

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, That the said Ronald Kaye Henderson is guilty of the crime of Violation of Section 187, California Penal Code (murder, first degree) and that he be punished by im-

[6]This does not mean that the proceedings of January 22 were discontinued at this time; to the contrary, the minutes of January 22 continue as shown.

prisonment in the STATE PRISON OF CALIFORNIA for life and that the Sheriff of Contra Costa County deliver the defendant into the custody of the Director of Correction at the California Medical Facility at Vacaville, California, and there deliver him.

''The defendant was then remanded to the custody of the Sheriff of the County of Contra Costa to be by him delivered into the custody of the Director of Corrections at the California Medical Facility at Vacaville, California.''

*As to Proceedings Relative to Second Judgment*

Psychiatric Report of Theo K. Miller, M.D., and Walter Rapaport, M.D., dated September 6, 1962:

''The Honorable Wakefield Taylor, Judge
Superior Court
Contra Costa County
Martinez, California

''Dear Judge Taylor:

''Pursuant to your order the undersigned Theo K. Miller, M.D., Superintendent and Medical Director of the Napa State Hospital, and Walter Rapaport, M.D., Superintendent and Medical Director of the Agnews State Hospital, examined the above-named Ronald Kaye Henderson to determine his mental condition with special reference to his plea of Not Guilty and Not Guilty by Reason of Insanity to a charge of violation of Penal Code, Sec. 187.

''Be it remembered that both examiners had seen Mr. Henderson and examined him on several occasions in October 1961. In addition, one of us, Dr. Rapaport, examined Mr. Henderson on December 24, 1961. Reports of these examinations were submitted to The Honorable Martin E. Rothenberg on the date of October 30, 1961 and the report of Dr. Rapaport under date of December 27, 1961. ... [Defendant] went to Vacaville on January 23, 1962 and in April was transferred to San Quentin Prison. He states that he was not placed on a psychiatric ward as [*sic*] San Quentin. The defendant states that he went to Court prior to going to Vacaville and he states that Judge Donovan was the judge. At this time he states that he never knew the charges that he was facing. When asked about his statement at earlier examinations wherein he told the examiners what the charges were, the defendant replied, 'If you know anything you can bring it up in court.' He states that when he went into Judge Donovan's court last year he had decided to fire his attorneys

because he did not feel that they were giving him a good defense. He states that on January 24, the day after arriving in Vacaville, he put in a Notice of Appeal and a lawyer was appointed to represent him and the appeal was completed on the grounds that the court had accepted a plea of Guilty at a time when the defendant had no lawyer. *He states that the matter of firing his lawyers and entering a plea of Guilty was his own idea and no one else had advised him.* [Italics added.] He states the lawyer who wrote the appeal was Robert Brilliant but that now he has another lawyer who was appointed by the court in Martinez. He states that his case is set for September 18 and that his plea is Not Guilty and Not Guilty by Reason of Insanity. He gives the victim's name as Joyce Marie Lovett, whom he had met about a year and a half before the incident. He states that he is now in jail for killing someone but goes on to say that he didn't kill anybody, that he wouldn't even kill a fly. Asked whether he had beaten women in the past, he states, 'That is in the past. I am talking about the present. There is no actual proof of anything.'

"The defendant states that he will answer any questions except those about the actual homicide. Asked if this means that he could answer if he wanted to or that he doesn't know the answers, the defendant replies that the examiners can form their own conclusion, and repeats that he will not answer question[s] or give any information about the homicide. He quotes the Penal Code and says, 'You can't walk into court and plead guilty unless evidence is introduced to prove a crime was committed, and there was no such evidence introduced in my case. *I entered a plea of guilty to get a new trial. I looked at books in the jail here and took a chance that the judge would refuse to accept my plea of guilty and appoint another attorney.*' " (Italics added.)

Proceeding with his scheme to procure a new trial it appears (from the official record of the proceedings in this action in the District Court of Appeal leading to the reversal of the first judgment, and in more detail than is related by the majority in respect thereto) that defendant under date of July 11, 1962, procured a stipulation as follows:

"IT IS HEREBY STIPULATED by and between the parties to the above-entitled action, through their respective counsel, that the judgment of conviction entered against the appellant on Jan. 22, 1962, by the Superior Court of the State of California, in and for the County of Contra Costa,

may be reversed by this Court and the matter remanded for retrial. The basis for this stipulation is that the appellant was erroneously allowed to enter a plea of guilty, while unrepresented by counsel, to a felony for which the maximum punishment was death.

"Dated: July 11, 1962

"STANLEY MOSK, Attorney General
of the State of California

"JOHN S. McINERNY
Deputy Attorney General

John S. McInerny
Attorneys for Respondent

Robert M. Brilliant
ROBERT M. BRILLIANT
Attorney for Petitioner

Ronald Kaye Henderson
RONALD KAYE HENDERSON
Petitioner"

The stipulation was then followed up by letters dated July 17, 1962, from defendant's then attorney, Robert M. Brilliant, and one dated July 18, 1962, from the Attorney General which read respectively as follows:

"Consistent with our telephone conversation of even date herewith with John S. McInerny, deputy attorney general, and the Clerk in the above-entitled Court, hereiwith [sic] is my stipulation, to wit: That the remittitur issue forthwith."

"Pursuant to the stipulation presently on file with the Court and relating to the reversal of this case, the People of the State of California hereby consent that the remittitur in this case may issue immediately by this Court upon the Court's entering the judgment of reversal "

With such stipulations before it the District Court of Appeal on July 19, 1962, entered its order:

"Pursuant to a stipulation of the appellant and counsel for the respective parties, the judgment of conviction entered against the appellant on January 22, 1962, by the Superior Court of the State of California in and for the County of Contra Costa is reversed and the case is remanded for a new trial. It is ordered that the remittitur issue forthwith."

Reading of the record at the second trial reveals that the evidence then taken was far more extensive and conclusive

than that received at the first trial. The evidence now before us is overwhelming not only that defendant perpetrated the atrocities and killed his victim but also that he did so intentionally, designedly, intelligently, because he enjoyed doing it, and because he had learned from having failed to kill at least one woman (whom he had tortured to some extent as he tortured his victim here) that despite her promises not to tell on him if he would let her live, she did eventually tell. Indeed, it develops she could not well have concealed what he had done because of the condition in which he left her. More particularly as to the case at bench the evidence establishes that defendant weighed something over 200 pounds; his victim weighed 100 pounds. The cruelties he perpetrated on her before strangling her are too revolting to unnecessarily detail, but some quotations from the transcript must be incorporated.

Indicative of the crafty legal acumen of this defendant is the fact that he testified that the atrocious mutilations of the deceased occurred *after* he had killed her by strangulation. Thus he would avoid a finding of murder in the first degree, which is required by statute (Pen. Code, § 189) where the proof shows that the killing was "perpetrated by means of ... torture." Likewise this man said he could not recall when or how he received the long scratches on his face (and did not explain his "black eye") although the evidence was unequivocal that he was "cold sober" shortly after receiving them and at the time he was arranging to get his car in order to dispose of the victim's body. He could not remember things that were difficult to explain in any such way as would absolve him from guilt but he testified that before killing his victim he did not hit or cut her or do any other violence to her body. He conveniently "passed out" or went to sleep and he "woke" or "came out" only after the violent acts had been committed. This man by his trick on the trial court—perhaps on the Attorney General—has secured one new trial and seems about to cheat justice again. He "Got a lot of pain and it made him black out like, and when he came to, he had a can opener in his hand and ... he looked at her and he realized he *strangled her and cut her up from the bottom part* with the can opener to the belly button. . . . He said that he went into the bathroom and strangled her and then he .... He just cut her up .... That he woke up and he found the can opener in his hand." Is it not significant to even a reviewing court that he reiterates that he

strangled her *first* and only *then* cut her up? Manifestly this testimony was significant to the jury and the trial judge.

The record at the second trial reveals evidence pertinent to both guilt and penalty which was not produced at the first trial. It was not received at the first trial because defendant at that trial avoided it by pleading guilty. One new witness at the second trial had been picked up by defendant at the same bar at which about one month later he picked up the victim in the case at bench. The witness related defendant's following her from the bar, offering to give her a ride home, her acceptance, her developing apprehension and attempt to leave the car, his beating her, wounding her in the head, and forcing her to disrobe and engage in unnatural acts. Then "He got some kind of thing ... and put it up in me ... he rammed it up in me in my privates ... and he also had his finger up my rectum ...." Each of these things, it appears he also did to the victim he killed in the case at bench.

The transcript proceeds "... he grabbed me by the hair ... and beat my head down against the seat and said ... 'I think I'll kill you now because, after all I did to you and after what you did to me,' he said, 'I still didn't come' ....

"He says 'I'm going to bite you up all over your body and I'm going to cut you wide open because I always wanted to see what a woman looked like inside,' I said, 'Please don't .... Don't kill me ...' He said, 'It wouldn't do you any good if you get killed.' I said, 'You'll die too,' and he said 'I don't care, when I go into these moods, what happens to me.'...

"He ... bit me on my right leg and my privates and my right side and bit me up on my breasts and my arms." (Five color photographs graphically corroborating the witness's testimony were received in evidence.)

Relevant indeed to the case at bench the witness continued: "I said, 'Just let me get out of this car. I don't care, any way, without any clothes, anything, just let me go. I won't turn you in or anything. ...

"And he says, 'No, I'm afraid to let you. I'm afraid you'll tell on me like the rest of the girls I have done.' " However, although he kept her "pants, bra, slip, purse, and a little jacket that went with the dress" she had on, he did let her go.

She "ran to a house and started ringing the doorbell," was admitted, the police were called and she went to the San Jose County Hospital. About two weeks later she received a

telephone call from defendant, and he said, "Oh, yes. You turned me in, didn't you? Now I'm going to get you. I'll get you one way or the other. I'm going to kill you." She reported that call to the police. That incident meant to defendant that he would not be so indulgent as to let his next victim live to tell her story. This record shows he kept that resolution.

After studying the record it is impossible for me to conclude that the defendant has been denied any element of a fair trial or due process, or that there has been a miscarriage of justice by the conviction and sentence of the appellant. In particular, although many instructions were necessarily given to the jury to cover the multiple aspects of the case, the charge (taken as a whole of course) is commendably comprehensive and free from error. The learned trial judge was especially careful in defining the degrees of murder and the necessity for proof of specific intent, reached by deliberation and premeditation, as a basis for first degree murder. Among other elements the judge emphasized that "To constitute this kind and degree of homicide the killing must be accompanied by a clear, deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under a heat of passion or other condition such as precludes the idea of deliberation. ... To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such choice, and, having in mind the consequences, decide to and commit the unlawful act causing death."

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied December 18, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.