FOURT, J.
This is an appeal from a judgment of conviction of murder in the first degree and of assault with a deadly weapon with intent to commit murder.
In an information filed in Los Angeles County on December 2,1965, Jethro Bolton was charged in count I with murdering Micha Thompson on November 8, 1965, with malice aforethought. In count II he was charged with committing an assault with a deadly weapon upon Cozetta Johnson on November 8, 1965, with malice aforethought and with intent to murder Cozetta Johnson. It was further charged that defendant on August 26, 1953, had been convicted of forgery in the County of Los Angeles and further that he had been convicted of burglary on or about January 22, 1957, and had served a term in prison therefor. Bolton pleaded not guilty; he admitted to the charged prior felonies. In a jury trial defendant was found guilty of murder in the first degree as charged in count I and of assault with a deadly weapon with intent to commit murder as charged in count II. Pursuant to stipulation by all concerned the matter of the penalty in the murder count was heard by the court without a jury. Defendant was sentenced to the state prison, the terms to run concurrently with each other. A timely notice of appeal was filed.
A résumé of some of the facts is as follows:
On November 8, 1965, at about 11 p.m. defendant, Cozetta *483 Johnson (the sister of Micha Thompson), Micha Thompson (the deceased), and Fred Snow, each of whom had been drinking during the day, arrived in Fred Snow’s car at the home of defendant’s sister, Minnie Murray, on South Compton in Los Angeles. While the persons mentioned were sitting in the living room, defendant began waving a pocket knife around and then cut Micha Thompson on the knee (the knife had a blade about 5 to 6 inches in depth); she got up, stepped out of her shoes and defendant then struck her. Cozetta Johnson could not determine whether defendant hit Micha Thompson with his fist or stabbed her because she, Cozetta Johnson, did not see a knife in his hand at that time. Micha Thompson then fell onto a couch. Defendant then stabbed Cozetta Johnson nine times. The last Cozetta Johnson remembered of seeing Micha Thompson was when she (Micha Thompson) was on the couch. Cozetta Johnson further stated that all four persons had been drinking during the day and that everyone had been very friendly prior to the cutting of Micha Thompson. On cross-examination she testified that at about 2 p.m. on November 8, 1965, defendant and Snow came to the house where she and her sister (deceased) were and suggested that they spend the afternoon together. Some beer was consumed and later in the evening some rum was purchased. She stated that the four of them rode around together and when asked whether defendant, Snow and Micha (deceased) were all drunk, she answered, “I don’t know that for sure. They were drinking.” and then stated that defendant was “under the influence of liquor.” She further testified that when defendant hit Micha Thompson it was around the head area and it did not appear to be a stabbing motion. On redirect examination, Cozetta Johnson testified, in effect, that she saw defendant “start to stab Micha Thompson.” When Cozetta Johnson left the room, Fred Snow, defendant and Micha Johnson were still there with the latter person lying on the couch. Fred Snow testified that he called the police because he had seen someone on the floor although he could not remember who it was.
Fred Snow also testified as a prosecuting witness that he had not seen a small pocket knife in defendant’s possession but had seen only a “shiny” object in defendant’s hand when he (Snow) was at the door of Minnie Murray’s house and he could not tell whether it was a knife. Further, he testified that he did not see a scuffle between Micha Thompson and defendant, or anything else. Other questions put to him *484 by the prosecutor and answers given by Snow were as set forth in the footnote.[1]
The prosecutor had in his possession a signed two-page typewritten statement made by Snow and a copy of the transcript of the preliminary hearing. After a showing by the deputy district attorney that he was surprised with and damaged by the testimony of Snow, he sought to impeach him. Snow was handed his typewritten statement and acknowledged that he had signed both pages of the statement. He was then asked whether in the statement he had said: “ ‘I was standing at the door talking to Cozetta and I heard Micha yelling, “No, no, no.” Cozetta ran inside and I saw Jethro with a knife in his right hand and he was holding down by his leg.’ ” Snow said that he had made such a statement. Snow was then shown his testimony at the preliminary hearing, held on November 18,1965, and was asked: “Now, I want to ask you now whether you have a present recollection as you sit here now as to whether or not the defendant had a knife in his hand on November 8 of 1965.” Snow replied: “No, it looks like a knife, . . . but I couldn't say exactly was a knife. I said it was a shiny object.” He further said in answer to a question by the judge at about this time, “Yes, I knew he had a knife.” and the judge asked “Well, now, did you see the knife?” and Snow replied, “No. I saw some shiny object. ’ ’
Parts of the preliminary transcript were then read aloud as follows:
*485 “Q. And what, if anything, did you see in Mr. Bolton’s possession ? A. He seemed to have a knife in his hand.
“Q. What kind of a knife was this? A. I don’t know exactly as it was pretty dark. It seemed to be some type of a shiny object.
“Q. You don’t recall whether or not you have seen that knife before? A. I saw his knife. I don’t know whether it was that one or not.”
Snow testified at the trial that he had so testified at the preliminary hearing.
An autopsy surgeon for the coroner’s office performed an autopsy on the deceased and found nine cut wounds on the body varying in size from several inches in depth to skin surface cuts. The doctor stated that six of the nine wounds were lethal in nature and that the stab wound at the base of the skull severing the spinal cord would have rendered her incapable of any further voluntary action. The blood alcohol of deceased was .19.
Officer Forbes, of the Los Angeles Police Department, arrested defendant at about 5:15 a.m. on November 9, 1965, after having talked with Snow. Defendant was sober at that time. Defendant was advised of his constitutional rights and ■as to his right to remain silent, his right to an attorney at all stages of the proceedings and that anything he said could be used against him in subsequent court proceedings. Defendant acknowledged that he understood the admonitions by the officer. Defendant was then questioned in the police car on the way to the station and he freely and voluntarily gave a statement to the police. Defendant related to the officer that he had consumed some beer and rum (about eight cans of beer and a half-pint of rum during about nine hours) on the date of the killing, that he found his money to be missing and called it to the deceased’s attention, whereupon she got mad and fearing that Cozetta Johnson and deceased might attack him, he then pulled out his knife and “cut” the deceased and Cozetta Johnson; that he then left the premises and slept that night in a vacant lot where the knife must have fallen out of his pocket.
Officer Larson, an investigating officer of the Los Angeles Police Department, arrived at the scene of the murder at about 12:45 a.m. on November 9,1965, and upon entering saw the body of the deceased on the floor in a pool of blood. He also noticed that the kitchen plastic drapes appeared to have been burned on the stove. Larson took pictures of the scene and these were introduced into evidence. Larson also ques *486 tioned defendant on November 9, 1965, about 9 :15 a.m. at the jail after advising defendant with reference to his constitutional rights. Defendant stated to Larson that he had been advised of his rights previously and then gave a free and voluntary statement to the officer. That statement was transcribed into writing and signed by defendant and the officers. Defendant therein stated, among other things, that he had accidentally cut decedent, that he got mad and when Oozetta Johnson came over he began cutting the decedent; that Oozetta Johnson had attempted to get hold of him and he cut her too; that the knife he had used had a blade about 3% inches long.
Officer Riley, of the Los Angeles Police Department, talked with defendant on November 9, 1965, in the police car on the way to defendant’s arraignment. Defendant told the officer that he had cut decedent while attempting to show her how he 'ivas going to deal with another person with whom he had had an argument.
Appellant now asserts that it was error for the trial court not to properly instruct the jury on its own motion on the issue of diminished capacity due to voluntary intoxication. There is no merit to the contention.
First of all there is no evidence in the record before this court showing any diminished capacity. At the very most, the evidence is that defendant appeared to one witness to be under the influence of intoxicating liquor. There is no evidence which in any way throws any light upon the effect, either physically or mentally, of any alcohol which defendant had consumed during the nine-hour period. Appellant did not testify in his own behalf, nor did he present any witnesses and, consequently, there is nothing in the record to show his mental state at the time of the stabbing and the murder. There is nothing in the record even to indicate that defendant, at the time of trial, contended he was drunk or that he was too drunk to formulate the necessary intent to commit the crimes of which he was convicted, nor is there anything in the record to indicate that defendant was relying upon or intended to rely upon the defense of diminished capacity to meditate the murder. There was no evidence of any psychosis or mental illness, or that defendant was suffering from any ailment or defect in reasoning caused by any disease of the mind.
In defendant’s statements to the officers there is no mention of his being drunk, or that he did not know fully what he was doing.
*487 The judge in the ease at bench gave full and complete instructions, among them being CALJIC 78 (voluntary intoxication—not a defense), and CALJIC 78B wherein the jury was told to consider whether defendant was intoxicated at the time of the offense and to inquire into the state of mind under which the defendant committed the act charged, if he did commit it. The jury was also fully instructed on manslaughter, both voluntary and involuntary, malice, first and second degree murder, premeditation and the various degrees of assault possible in the case and “Concerning Heat Of Passion And Provocation. ’ ’ Appellant relies mainly upon what is said in the cases of People v. Conley, 64 Cal.2d 310, 325 [49 Cal.Rptr. 815, 411 P.2d 911] and People v. Henderson, 60 Cal.2d 482, 492 [35 Cal.Rptr. 77, 386 P.2d 677].
In Conley, supra, cited by appellant, the trial court refused to give instructions on manslaughter. The evidence in part was that Conley had consumed whiskey, vodka and wine for three days before the killings, that he had consumed medication to relieve the pain of an injury and such medication could have increased the effect of the alcohol he had consumed. Conley testified that he did not intend to kill anyone, that he remembered nothing from the time he was drinking at his sister’s house until his arrest. A psychologist testified that defendant was in a dissociative state at the time of the killings and because of personality fragmentation did not function with his normal personality. Both sides requested manslaughter instructions and the judge refused such. It is readily apparent that the facts of Conley and the case at hand are entirely different.
Furthermore, the case at bench was tried before Conley, supra, was decided.
In the Henderson case (60 Cal.2d 482) Henderson testified that he had no intent to harm the deceased and that he had no control over his actions because of his intoxication and mental illness not amounting to legal insanity. Two psychiatrists testified that because of defendant’s mental state he did not premeditate before the killing; one stated that Henderson was psychotic and legally insane at the time of the murder. The judge did not instruct on the legal significance of the evidence of defendant’s mental illness and refused to give a proffered manslaughter instruction. Again it is apparent that the facts of Henderson are in nowise similar to the facts of the ease at bench.
In People v. Bandhauer, 66 Cal.2d 524 [58 Cal.Rptr. 332, *488 426 P.2d 900] the defendant asserted that . . there was evidence that he was sufficiently intoxicated to lack the malice necessary to constitute murder, and therefore he was entitled to a voluntary manslaughter instruction on the theory of diminished capacity.” (Page 528.) The court said: “The record does not support this contention. Although Smith was refused drinks during the evening because of his apparent intoxication, defendant was not. He was not seen to have had more than six or seven beers during the six hours he was at various bars between 8 p.m. and 2 a.m., and he did not appear to be intoxicated. There is no evidence that his drinking had any substantial effect on him, or that he was so intoxicated that he did not or could not harbor malice. There is thus no substantial evidence of diminished capacity to support a voluntary manslaughter instruction on that theory.” (Italics added.) (P. 528.)
Some of the jurors, during their deliberations, asked questions of the court, none of which indicate that they were concerned with diminished capacity from intoxication in any respect. The questions[2] seem to indicate that the jurors were concerned with whether or not a murder took place during an act of passion.
There is no merit to the contentions of appellant. In any event, there is no miscarriage of justice in this case as conducted. (Cal. Const., art. VI, § 4½.*)
The judgment is affirmed.
Wood, P. J., and Lillie, J., concurred.
A petition for a rehearing was denied November 14, 1967, and appellant’s petition for a hearing by the Supreme Court was denied December 27,1967.

“Q Let me ask you this: At any time, did you see a small pocket knife in the possession of the defendant Bolton?
“A No. I saw a shiny object in his hand at the door. I don’t know whether it was a knife or not.
‘ ‘ Q Did you see what appeared to be a scuffle or something resembling it occurring between Micha Thompson and defendant?
“A No, I didn’t.
“Q Would you tell us what you did see?
“The Witness: I didn’t see anything.
“.
“Q Who did you see lying on the floor?
“A I saw a woman lying on the floor.
“Q Was that Micha Thompson?
“A I don’t know whether it was her or not. I didn’t take a good look.
“Q Did you see Cozetta Johnson?
“A No, I didn’t.
“Q You didn’t see Cozetta Johnson?
“A No.
“Q You were talking to her near the door there, weren’t you, sir?
“A No, I don’t remember.
“Q You don’t remember?
“A No.”

“We raised the question up there whether the element of passion first degree murder can enter the picture before—we wanted to know how the law defines the element of passion in first or second degree murder. Can you have an element of passion before murder is committed or not, first degree murder?”
“We wanted to know if a man could—an instance arise where a man could lose his temper and be aroused passionately and commit murder, would this be a first degree murder, if he did at that time, or he got mad first and then he killed somebody, but he killed them after he got mad, could this be first degree murder?”
“ ‘Judge: Define difference between first and second degree murder if intent to kill was after third or fourth knife wound after first. Would this be first or second degree murder, or would intent to kill have to start from first knife wound?' ”
“Can premeditation conceivably occur during an act of passion?”

Now § 13. See Constitutional amendments, Nov. 8, 1966.